UNITED STATES of America, Appellee,

v.

Ronald CECIL, Appellant.

UNITED STATES of America, Appellee,

v.

Patrick HADDIX, Appellant.

UNITED STATES of America, Appellee,

v.

Odus HAYES, Appellant.

Nos. 83–5148, 83–5159 and 83–5191.

United States Court of Appeals,
Fourth Circuit.

Argued June 1, 1987.

Decided Jan. 11, 1988.

Rehearing and Rehearing In Banc
Denied Feb. 5, 1988.

Alan Dershowitz, Cambridge, Mass., Barbara Gold, Baltimore, Md., Robert L. Rubinstein, Miami, Fla. (Gerson S. Horn, Beverly Hills, Cal., Dirk Bruinsma, Mission Viejo, Cal., on brief), for appellants.

J. Sedwick Sollers, III, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., John G. Douglass, Asst. U.S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE, CHAPMAN, WILKINSON and WILKINS, Circuit Judges, sitting en banc.

DONALD RUSSELL, Circuit Judge:

This appeal arises out of a conspiracy prosecution for the transportation by boat from Lebanon into the United States of 36,000 pounds of hashish. A large number of individuals were involved. Twenty-two of these were named in the indictment. The operation contemplated delivery of the hashish at sea off the coast of Lebanon. The conspirators had acquired a "lake" vessel to take delivery of the hashish from a couple of coast-wide ships. The vessel was to proceed across the Mediterranean Sea through the Straits of Gibraltar into the Atlantic. At some point between the coast of Portugal and the Island of Madeira, the ship, which was inadequate for an ocean crossing, would rendezvous with an ocean-going ship, to which the hashish would be delivered. The ocean-going vessel was to be met off the Maryland coast by coast-wide boats, which, after the hashish had been transferred from the ocean-going vessel, would land on shore where trucks would be available to transfer the hashish to a secluded house a short distance from the shore where the hashish would be

stored until it could be distributed to various areas in the United States. A force had been employed and brought to the storage area to carry out the removal of the hashish from the boats and for transporting the illegal shipments to the place of temporary storage for later distribution.

From the testimony it would appear that Harold (or Otto) Hughes, a resident of California, and a person with a long involvement in drug smuggling into the United States, was in charge of certain of the shore operations in Maryland. Hughes had an assistant to whom he delegated various duties in connection with the conspiracy, Richard Creswell. Among the tasks Hughes assigned to Creswell was the leasing in his (Creswell's) name of the house where the hashish was to be unloaded and temporarily stored until it could be distributed. An apartment in another part of the area, not too far away was also leased by Creswell to be a headquarters site for the operation and for the persons engaged in the landing and distribution of the hashish.

Sometime after the hashish had been transferred from the ships to storage, and presumably had been removed for distribution about the country, Creswell was suddenly confronted by officers when he arrived in a car at the storage area. Upon request he identified himself to the officers as John Richard Campbell and presented an expired Canadian driver's license as well as a Canadian birth certificate issued him in that name. The officers remembered hearing that a "John Campbell" had been involved in charges of drug violations. When this information was verified, they arrested Creswell. Following his arrest, Creswell signed a consent waiver for the search of the house and the officers searched the house and discovered evidence that hashish had been stored there. Creswell later entered into a plea bargain agreement with the Government under which he agreed to state truthfully his knowledge of the conspiracy. In carrying out that agreement, he gave the Government an extensive statement, in which, among other things, he named defendant Cecil as a participant in the conspiracy.

At the subsequent trial, Creswell testified as a Government witness. A number of the other conspirators had entered pleas of guilty under plea agreements as had Creswell. The three appellants herein, however, entered not guilty pleas, went to trial, and were convicted. From their convictions they have appealed.

I.

By their appeals, three questions are presented for review. Two of these have been carefully briefed and the oral arguments focused on these two issues. The first of these questions relates to an evidentiary ruling by the district judge regarding the admissibility of certain unsworn evidence relating allegedly to Creswell's credibility as a witness. Cecil sought admissibility of this evidence and, upon the denial of admissibility, he alone appeals. The second of such questions is common to all defendants, Cecil, Haddix and Hayes, and represents an attack on the constitutional validity of the use of the Maryland voters registration list as a source for the random selection of the jury panel. The third issue relates to the appeal of Hayes. He contends that the evidence was insufficient to support his conviction for conspiracy to import into the United States, and to possess with intent to distribute, hashish. We shall consider these questions separately, beginning first with the issues raised by Cecil alone.

II.

It is important in addressing the first issue to determine exactly what this issue, as pressed at trial by Cecil, was. Cecil, in his brief, has stated the issue in absolute terms: "Whether the trial court committed reversible error by excluding all testimony, cross-examination and argument relating to the mental condition of the government's key witness." He also contended that not only did the court erroneously preclude all cross-examination on this issue of Creswell's mental condition, but it also erroneously "excluded *proffered expert testimony* of the very psychiatrist who had examined Creswell" which was to be the basis

for such cross-examination. (Italics added) Finally, he declares that the district court erred in denying his request "for a new psychiatric examination of Creswell (Transcript of 3/28/83 at 139)." Such are Cecil's claims of error. Cecil emphasized the importance of this evidence which he claimed demonstrated the want of credibility in Creswell's testimony which, he said, was the only evidence of his involvement in the conspiracy.

It is undoubtedly true, as Cecil argues, that Creswell's testimony was important, if not critical, to sustaining Cecil's conviction. Though it might be said that there was some circumstantial evidence in the record which indicated Cecil's participation in the conspiracy, the only "live" witness who testified to Cecil's actual participation was Creswell. It was but natural under those circumstances that Cecil should make every possible attempt to discredit the credibility of Creswell as a witness, by any relevant evidence he could marshal. This was particularly important if he did not intend to offer any direct testimony attacking directly the accuracy and truthfulness of Creswell's testimony. He accordingly attempted to undermine Creswell's testimony by introducing a record, which he said demonstrated Creswell was not a credible witness. It is the refusal to admit this specific material in evidence that constitutes the real claim of error on this first point.

Cecil did not actually raise the admissibility of this evidence until the trial had been proceeding for almost a week. Near the end of the Government's testimony and just before Creswell was to testify, Cecil's attorney advised the United States Attorney that he intended to use, during his cross-examination of Creswell, the record of a Rule 12.2 Notice,[1] along with certain supporting documents, filed by Creswell's attorney in a prosecution in the Eastern District of New York under a 1981 indictment for jumping bond given in connection with a 1977 prosecution for a violation of the Controlled Substance Act. The United States Attorney promptly requested the district judge to hold an *in limine* hearing on the admissibility of such record as a basis for cross-examination of Creswell and to dispose of the matter before Creswell testified. Without objection from Cecil, the district judge granted the motion and suspended for the moment the trial in order to hear the motion.

At the hearing, it developed that Cecil's counsel did not actually have available the record in the 1981 case in the Eastern District of New York, which he was seeking to have admitted. Counsel, however, did say that the 1981 prosecution grew out of an earlier prosecution in 1977 in the same court of Creswell for violating the Controlled Substance Act. Creswell had jumped bond in 1977 in that prosecution and had not been apprehended until early 1981. When apprehended, he was indicted in the same court for jumping bond. It was in this 1981 fugitive prosecution in New York that Creswell's attorney filed the Rule 12.2 Notice of an intention to assert a defense of diminished capacity and insanity which is the first item the defendant Cecil sought to have admitted in evidence. The Notice was accompanied by a supporting "tentative" statement of Dr. Seymour Kuvin, who was identified as a psychiatrist. Counsel apparently had procured this statement of Dr. Kuvin and he proceeded to publish it to the court:

> Although I cannot present any finite psychiatric opinions without a psychiatric examination of Mr. Creswell, from the information supplied, it is highly probable that Mr. Creswell exhibited a pathological personality disorder in his most unusual attachment to his mother.

After reading this statement of Dr. Kuvin, Cecil's counsel characterized the description of Creswell's stated disorder as an "Oedipus complex." Counsel, also, read a statement which he said appeared as a declaration in the Notice:

> On Wednesday, June 3, 1981, at approximately 4:00 p.m., defense counsel met with Dr. Kuvin and discussed with him his interview with Richard Creswell. At that time he orally advised counsel that, in his professional opinion, the defense of

---

1. Federal Rules of Criminal Procedure.

diminished capacity and insanity were real defenses.

It seems obvious from this last statement that the psychiatrist had in the meantime personally interviewed Creswell but the report of such interview or interviews was not available at the time.

Cecil's counsel stated for the district judge his theory of the relevancy of this evidence. He said that his theory had two prongs: First, the evidence would constitute proof "of the witness' disability to perceive, recall or recollect," and, second, that it would represent proof "[t]hat Mr. Creswell will do anything, including enter a plea of not guilty by reason of insanity, in order to avoid punishment, just as he did here in entering into a plea agreement." Later, in argument, Cecil's counsel, joined by other counsel in the case, elaborated somewhat on the second ground, arguing that Creswell had "utilized the not guilty plea by reason of insanity intentionally and purposefully, not believing it for one moment" and "that he is doing the same thing in this case...."

After observing that he was being forced to rule on the admissibility of the evidence without having available the actual record in the New York 1981 prosecution, the district judge ruled that on the showing made the evidence was irrelevant to the issue of the present competency of Creswell and would, if admitted, require the court to examine into an extraneous matter with great loss of judicial time and perhaps unnecessary prejudice to the witness and the Government's case.[2] He explained that he could not understand how a claim that Creswell was not to be held responsible for jumping bond because he "panicked" at the thought of the adverse effect that his trial and conviction would have on his mother, to whom he had an "inordinate" attachment, and who was at the moment dying of cancer, could be regarded as relevant to Creswell's action six years later when his

mother had long since died. The district judge, however, added:

> I just want—I want you clear on what my ruling is before we start. If there is need to reconsider and the records come in and you want me to reconsider the ruling, I will certainly reconsider.

Thus ended the first hearing on the admissibility of this evidence.

On the next day after the first hearing, Cecil's counsel requested a rehearing of the earlier ruling, explaining that he now had received the 12.2 record from the New York Court. He produced the 12.2 Notice and the tentative opinions of the psychiatrist said to be included in the file with the Notice. This file included a report by the psychiatrist of the latter's interviews with Creswell together with a diagnosis by him of Creswell's personality based on those interviews. The report of five pages covered three interviews of Creswell by Dr. Kuvin in late May or early June, 1981. Dr. Kuvin declared that these interviews gave him an opportunity to observe fully Creswell's "verbal as well as non-verbal behavior." Dr. Kuvin observed generally in the beginning of his letter that Creswell had been "cooperative and candid throughout the entire examination." By questioning Creswell, the psychiatrist obtained and recorded an account as given by Creswell of his life history, with particular emphasis on the close relationship with his mother and his outstanding attentiveness to her during the time when she was dying with cancer. This seemed to be the primary fact observed by the psychiatrist; at least it was the only conduct of Creswell which the psychiatrist particularly noted in his report. During the interview, Dr. Kuvin said he found Creswell only to be "vague" about the events at his arrest and he seemed to accept Creswell's explanation that his vagueness was the result "of his fear that his arrest would disturb his mother and [cause the officers] to search her house." The psychiatrist gave his opinion that this

---

**2.** In *United States v. Lopez,* 611 F.2d 44, 46 (4th Cir.1979), we laid down as one of the limitations on use of mental impairment as a means of assailing attacks on credibility that the evidence must not "introduce into the case a collateral

issue which would confuse the jury and which would necessitate allowing the Government to introduce testimony explaining the matter." (*Quoting United States v. Mucherino,* 311 F.2d 172, 174 (4th Cir.1962)).

fear of Creswell of distress that might be inflicted on his mother was real and "inordinate." Dr. Kuvin further emphasized that whenever the conversation turned to his mother, Creswell would "become echolalic and would repeat questions in an anxious fashion rather than answer them directly." Dr. Kuvin found that Creswell's emotional problems were "predicated on faulty emotional training in early childhood. His father was a nullity emotionally. His mother was his only attachment...." The psychiatrist attested to the fact that Creswell "was oriented as to time, place and person, however, and does not appear to have any gross memory deficits although he did tell of the vagueness of recall for the events surrounding the arrest. He also does have some spotty memory losses but these were not sufficient so as to suggest organic brain disease (brain tissue injury) but rather were functional in nature." He found Creswell's "[a]ssociative thought processes are, for the most part, intact." All in all, the report included no adverse comments on Creswell's credibility.

His "diagnosis" of Creswell, which followed this recitation of Creswell's background, was that he had a "narcissistic personality disorder," which he described as possessing the "criteria" of "an increased or even grandiose sense of self-importance or uniqueness with exaggeration of achievements and talents; a preoccupation with fantasies of unlimited success and power, the requirements of constant attention and admiration, either cool indifference or marked feelings of humiliation and inferiority or emptiness in response to criticism; and the expectation of special favors in taking advantage of others to indulge one's own desires and lack of empathy."

Dr. Kuvin gives no examples of Creswell's conduct or statements during the conversations which he had with Creswell that qualified under any of these criteria. Thus, the psychiatrist did not find that Creswell had been boastful; that he had exaggerated his actions; that he had made claims of any particular talents or achievements; nor that the psychiatrist reported any "fantasies" on Creswell's part. In short, he supplied no instance of any conduct or action of Creswell which fitted the criteria catalogued by the psychiatrist as a basis for that diagnosis. However, on the basis of that diagnosis, Dr. Kuvin gave this final opinion:

This examiner is of the opinion that his behavioral pattern in terms of the events that occurred after his arrest is classical. His grandiosity superceded the rules of society. He endowed himself with unlimited powers. This, *coupled with his pathological attachment to his mother and his need to protect her in any eventuality produced the resultant leave to Santa Barbara.* This examiner is of the opinion that Mr. Creswell's actions are product of his mental illness and precluded him from conforming his conduct to the requirements of the law. (Italics added)

Cecil's counsel also presented to the court at that time a third document for admission and it is this document which Cecil wanted particularly to get into the record. It was not a part of the record from the New York Court. It had been undoubtedly prepared hastily, presumably by Cecil's counsel, and had been signed by the psychiatrist on the very day that this matter was first heard. It was styled a "Certification." In this unsworn statement Dr. Kuvin declared that "[i]t is my further opinion that the facts and conclusions set forth in Exhibit A and those hereafter stated would exist today assuming the absence of any psychiatric therapy and/or counseling by Mr. Creswell from the date of my examination to this date [March 23, 1983]." In two later paragraphs of the "Certification," he proceeded to set forth an opinion that, as a result of the "temptation" that the "benefits" provided by Creswell's plea bargain in this case (which the psychiatrist states he had read) coupled with his "personality disorder precludes him from providing truthful testimony, in all medical probability, given the circumstances at hand" (Paragraph 11) and that these "sufficient inducements and opportunities offered in that agreement ... provide[d] stimulus to Mr. Cresswell so that in the

face of this personality disorder, there is little likelihood of his testimonial capacity being credible." (Paragraph 14). The manifest purpose of this "Certification" was to provide first a basis for connecting the psychiatrist's opinion, as stated in his letter detailing his report on his interview of Creswell in 1981, with the opinion he gave on Creswell's credibility in the 1983 "Certification." In short, this "Certification," with its connection back to the psychiatrist's opinion in 1981, was critical to the psychiatrist's opinion that Creswell in 1983 was incapable of telling the truth, which was the specific opinion of Dr. Kuvin, which, as we have said, Cecil wished to get into the record. The United States Attorney promptly advised the district court and Cecil's counsel at this point in the hearing:

Just so you are clear, Your Honor, on the psychiatric report from 1981, we have no objection. We do object to the certification. It is a hearsay document. That was prepared yesterday.

It is obvious that the United States Attorney made his concession because there was nothing in the 1981 report of Dr. Kuvin which would have given any credence to Cecil's attack on Creswell's credibility as a witness in 1983 in this case. His objections went to the only statement given by Dr. Kuvin which was related to Creswell's credibility. The United States Attorney was, thus, emphatic in his objection to the admissibility of the "Certification," which he characterized as unsworn hearsay, admissible, if at all, only after opportunity to the government to cross-examine Dr. Kuvin. The district judge, after this statement by the United States Attorney of his concession, addressed to Cecil's counsel: "That (referring to the "Certification") looks a little suspect. Why don't you bring him (referring to Dr. Kuvin) down?" Cecil's attorney responded that Dr. Kuvin was "under subpoena, Your Honor. He is willing to come anytime the Court wishes to beacon (?)." Cecil's counsel then explained why he wanted to introduce the "Certification" and its relevancy as he viewed it. He said the "Certification" was relevant "for the purpose of showing this

man (Creswell) is very manipulative" and was capable of "doing anything to frustrate the judicial process." He also said the "Certification" raised the issue "whether this man is capable of telling the truth," saying that by this Certification the defendant Cecil had "documented the fact that a psychiatrist states that in his (Creswell's) condition he is incapable of telling the truth when offered the alternatives that the Government presented him [in the plea agreement]." The district judge somewhat incredulously inquired of the counsel if he really expected the Court to admit as evidence the "Certification." To this counsel responded: "That is what the doctor has written, and I am presenting it to the Court." He proceeded to ask that the "Certification" be marked as an exhibit. The district judge responded by ruling that the document could be marked for identification but that he was "not going to accept a certificate which is not subject to cross-examination in evidence." Counsel at this point requested that the trial be interrupted in order that there might be a psychiatric examination of Creswell. The district judge said he would not interrupt the trial for a psychiatric examination, adding

If you wanted this back—this has been in preparation for months and months. I am not going to stop in midstream for a psychiatric examination. If you [had] wanted one under the Rule, you should have asked for it long ago, and not in the middle of trial.

The district judge then ruled that the material which the defendant wished admitted in evidence was inadmissible. He emphasized that such notice "was never the basis for an insanity plea in New York" and observed that all of Dr. Kuvin's material represented unsworn statements, on none of which had Dr. Kuvin been cross-examined. He ruled Dr. Kuvin's "Certification" inadmissible and reiterated his ruling against the admissibility of Dr. Kuvin's letter filed in the 1981 proceedings.

The first fact to be noted is the absolute difference between what Cecil in his brief claimed to have been the erroneous ruling of the district judge and what actually the

district judge had ruled in the hearings just discussed. As we have seen, Cecil charges that "the trial court committed reversible error by excluding all testimony, cross-examination and argument relating to the mental condition of the government's key witness [*i.e.*, Creswell]." The district judge, however, did not exclude "all testimony, cross-examination and argument" relating to Creswell's mental condition. He was never called upon to make any such ruling. What he was presented with was an attempt by Cecil's counsel to introduce into the record for use in his cross-examination of Creswell two specific items: the first was the record of the Rule 12.2 notice filed in the New York prosecution, consisting of the notice itself, the tentative opinion (Oedipus Complex) of Dr. Kuvin and his second report of his psychiatric examination of Creswell, both of which reports were included in the file of the New York prosecution; the second was the "Certification" of Dr. Kuvin signed by Dr. Kuvin the day this issue arose some week after the trial had begun in 1983. All of these items, Cecil wished admitted, even though the qualifications of Dr. Kuvin had not been established in a *voir dire* hearing, nor had his opinion been subjected to any confrontation on cross-examination. What basically this aspect of the appeal is concerned with are these specific items and only these items submitted for admission in evidence under the circumstances stated. Cecil had, it is true, added two others, neither of which is entitled to much consideration. The district judge refused to admit as evidence the "Certification" when Dr. Kuvin who, though duly subpoenaed, failed to appear as a witness without any valid excuse. This represents Cecil's charge of error in "exclud[ing] proffered testimony of the very psychiatrist who had examined Creswell." The "proffered testimony" was not live testimony of Dr. Kuvin but his bare opinion, an expert opinion to be admitted without any proof of the expert's qualifications and without any opportunity for the Government to test the opinion on cross-examination. The district judge had repeatedly refused such opinion of Dr. Kuvin in the absence of a cross-examination of the psychiatrist. The other secondary objection is apparently the failure of the district court to interrupt the trial, after all the testimony had been taken, and the court was prepared to submit the cause to the jury, for the purpose of ordering, at Cecil's insistence, that Creswell be subjected to a mental examination. These are all the issues that are involved in this claim of error by the district court. They are much narrower and more precise than Cecil would state them. We shall consider each of the proffered items, beginning first with the 12.2 proceedings.

It must be recognized at the outset that the 12.2 notice and its related material were of doubtful admissibility under the Rule in any circumstances. While Creswell's counsel filed with the court in the New York prosecution the 12.2 notice along with the two statements of Dr. Kuvin, Creswell never filed a plea of diminished capacity and insanity. As a matter of fact, the notice itself was dismissed by the court as untimely and Creswell abandoned any attempt to proffer such a plea. Under those circumstances, it is arguable that subdivision (e) of Rule 12.2 which provides that the notice required under the Rule, if "later withdrawn, is not," "admissible," "in any civil or criminal proceeding," "against the person who gave notice of the intention," is applicable. As explained by the Committee Notes, this subdivision of the Rule was included to meet the test of *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) which held that "the privilege against self-incrimination is not violated by requiring the defendant to give notice of a defense where the defendant retains the 'unfettered choice' of abandoning the defense." In a subsequent clarifying amendment, the Rule was amended to make clear what had already been done in 1979 in similar language in Rule 11(e)(6), to wit, that the proscription applied to any proceeding "without regard to whether the proceeding is against that person." It is true that these amendments were adopted April 28, 1983, to be effective August 1, 1983, 89 Stat. 373, which was a short time after this trial. However, these amendments had been under discussion for a long

time before this trial and the Report of the Rules Committee and the Recommendations of the Judicial Conference were well known before March, 1983. Moreover, the amendments had a constitutional basis which would have been as applicable before March 1983 as well as afterwards when the Rules had been amended. Under those circumstances the notice, with its additions, which was never pressed or ruled on on the merits by the New York Court and which was abandoned by Creswell, would be inadmissible.

█ Apart from this objection to the admissibility of this evidence, it is plain that the district judge was correct in finding that this evidence was irrelevant to the issues in the 1983 prosecution, and, if admitted, would have introduced an extraneous matter that would have required a great waste of judicial time. Dr. Kuvin's report on his 1981 examination, included in the 12.2 file, dealt with the emotional condition of Creswell in 1977 when he jumped bond. A fair reading of the report demonstrated that Dr. Kuvin's opinion was that Creswell's action in jumping bond in 1977 was prompted by his "unusual" and "pathological" attachment to his dying mother and his desire to protect her from the sorrow, distress and humiliation that would have followed his trial and conviction. It was this attachment to his mother, not to any narcissistic condition, that was the only possible excuse assigned in the opinion of Dr. Kuvin for Creswell's action in 1977.

Certainly, those same considerations did not exist in 1983 when Creswell was testifying in this case. His mother had been dead for six years and there was no reason to seek to shield her from knowledge of Creswell's wrongful conduct. Beyond that, the 1983 case is entirely different than the one in which Dr. Kuvin gave his opinion in 1981 on Creswell's emotional condition. To have admitted the Notice and its accompanying material would have opened up the whole question of Creswell's relationship to his mother and its effect on him emotionally, thereby injecting into this case practical-

ly a trial of Creswell's defense to the bail jumping charge.

█ The only possible connection between the 1981 and the 1983 opinions is the "narcissistic disorder" of Creswell, according to Dr. Kuvin, which contributed equally to Creswell's action in 1977 and to his inability in 1983 to tell the truth. This constitutes, as we have said, the only possible basis for contending that the 1981 report has any relevance to Creswell's 1983 testimony. In other words, the 1981 examination is only relevant if it can be said to qualify Dr. Kuvin's 1983 opinion. Accordingly, to make out his claim of error, Cecil must establish that the diagnosis of Creswell as possessing a "narcissistic personality" demonstrated "an accepted causal link" to his inability in 1983 to tell the truth. Yet, by his description of a "narcissistic personality," Dr. Kuvin would find a person to possess such a personality if he qualifies as a self-centered braggart, exaggerating his talents and achievements, and deluding himself with his power and attainments. As we have said, it is impossible to find in Dr. Kuvin's report of 1981 a finding of the possession of any of these characteristics which Dr. Kuvin said were the "criteria" of narcissism, or to provide a "causal link" between a narcissistic personality disorder and Creswell's alleged inability to tell the truth.

Narcissism is no new term as descriptive of a person's accustomed conduct, either in literature or in psychiatry. It has been with us since the Latin poet Ovid first told the story of the youth Narcissus, who fell so in love with his own reflection in a fountain that he fell in, seeking his picture and was drowned. It came to be expressive of what the Supplement to the Oxford English Dictionary, volume 2, p. 1129 said was "[s]elf love and admiration that found emotional satisfaction in self-contemplation," or, as the Random House Dictionary of the English Language defines as "self-love; egocentrism," p. 950. Narcissism as such is a condition that has been associated with many distinguished figures. The Oxford Dictionary quotes an author's characterization of Shelley as having a narcissis-

tic personality and Coleridge spoke of engaging in narcissistic contemplation on his part. It has been used to describe a "self-centered" society. It is a term applied to the modern university student in the current best seller, *The Closing of the American Mind* by Bloom, (Random & Shuster, 1987), pp. 82 *et seq.* It was Freud who introduced the term into psychoanalytic jargon but he did so by speculating "that the detached libido is reinvested and attached to the patient's own ego" in the narcissistic personality, or, as Bloom, *supra* at 148, put it, "Freud concentrated on the id, or unconscious as the motor of the most interesting spiritual phenomena, and the related ideas of sublimation and neurosis."

It seems indisputable that the "Certification," which is the only part of this material which could have any possible relevance to the issue in this case, could not have been properly admissible without subjecting Dr. Kuvin to cross-examination in a *voir dire* hearing and even Cecil's counsel seems to have agreed on this.[3] In *United States v. Gillis*, 773 F.2d 549, 554 (4th Cir.1985), we said: "We have recognized the importance of developing the factual basis of psychiatric testimony regarding mental responsibility, *see, e.g. United States v. Wilson*, 399 F.2d 459, 462 (4th Cir.1968), and have granted prosecutors wide latitude in cross-examining expert witnesses on the issue. (citing cases)." In *Wilson*, Judge Sobeloff, in dissenting, said (399 F.2d at 464):

> A psychiatrist has the obligation to present the jury with the underlying data upon which his opinion is predicated. Unsupported conclusions do not give the jury an enlightening view of the defendant's condition. The jury should be afforded a full opportunity to focus on the dynamics of defendant's mental and emotional processes and on his capacity to control his actions, rather than to be found to wrestle with esoteric psychiatric terminology.

And, Rule 705, Fed.R.Evid., clearly confers on the other party where mental capacity is raised in psychiatric testimony the right to probe into the basis for the expert's opinion. Thus, it states: "The expert [witness] may in any event be required to disclose the underlying facts or data on cross-examination." And that requirement was particularly important in this matter. The psychiatrist had diagnosed the mental difficulty of Creswell to be represented by a "narcissistic personality disorder." He identified the "criteria" that characterized such condition. Yet in his five-page report of his extensive interviews of Creswell, he never identified a single one of these "criteria" which he had observed in Creswell during his interview. The only unusual thing he observed about Creswell, as he recorded his observations, was his "inordinate" and "unusual" attachment to his mother. That was not one of the "criteria" associated with a diagnosis of a "narcissistic personality disorder." Beyond this, his opinion given in his "Certification" that Creswell was incapable of telling the truth was based on what he said was the fact that Creswell's "narcissistic personality disorder" so weakened his conscience from what it would be in a person with a normal conscience that it was possible for the Government to seduce him with the terms of his plea bargain to such an extent that he became incapable of telling the truth. This statement is so full of unsupported and incredible assumptions that cross-examination in a *voir dire* hearing of the psychiatrist was required before this extravagant extrapolation could be accepted in evidence.[4]

---

**3.** During the March 28 hearing, Mr. Horn, Cecil's counsel told the district court:

> Your Honor, perhaps it would be best to conduct a voir dire and satisfy the Court that the foundation is proper and that this doctor can express a personal opinion and/or a psychiatric opinion in regard to this particular witness.

**4.** We repeat the psychiatrist's odd opinion in this regard:

> It is understood that Mr. Cresswell has been offered certain benefits to testify as a witness. The benefits offered would provide temptation to any man; however, conscience structure would intercede and preclude someone with a normal personality pattern from distorting the truth. A witness, from a psychiatric viewpoint, must observe clearly, remember fully, and be able to testify without suppressing or distorting the truth. In this in-

Actually, Dr. Kuvin's opinion that Creswell has a "narcissistic personality disorder" is nothing more than idle speculation without some supporting facts to sustain that opinion. Without an opportunity to cross-examine Dr. Kuvin on his opinion, his unsubstantiated bare opinions were not entitled to be admitted and the district judge correctly ruled that they were inadmissible, absent cross-examination of Dr. Kuvin. Any other ruling would have been contrary to Rule 705. What actually Cecil sought to do—and this is basically his claim here—was to have the district court admit the unsworn opinion of Dr. Kuvin, as set forth in his "Certification" without permitting the government any opportunity in cross-examination to probe the basis for his opinion.

■ As a matter of fact, the opinions of Dr. Kuvin which the defendant wished to introduce without presenting Dr. Kuvin for cross-examination for the basis for his opinions, were in effect statements on the ultimate result to be reached by the jury in this case. This conclusion follows from the fact that, according to the defendant, the testimony of Creswell was the only testimony connecting him (Cecil) with the conspiracy. If this testimony was from a person who was incapable of telling the truth, then there was no evidence of guilt of Cecil in the record. Despite the breadth of those opinions of Dr. Kuvin and their lack of supporting bases, the defendant states that the opinions were admissible under Rule 704, Fed.R.Evid. What Rule 704 does is simply to authorize the trial judge to admit opinions on the ultimate fact when helpful to the trier of fact, but, as the Committee Notes make clear, it "does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. *These provisions provide ample assurances against the admission of opinions which would merely tell the jury what result to reach,* somewhat in the manner of the oath-helpers of an earlier

stance, Mr. Cresswell's personality disorder precludes him from providing truthful testi-

day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria." (Italics added). Moreover, Rule 703 must be construed along with Rule 705, which requires the expert "to disclose the underlying facts or data on cross-examination."

Beyond this, while the Rule permits an expert to testify on ultimate issues if the district judge finds such evidence helpful, that principle has never been extended to the right of a psychiatrist to give an opinion on the credibility of a witness. That determination of credibility is one strictly for the jury. Many cases, decided after the adoption of the Federal Rules of Evidence, have so held. In fact, the authorities seem uniform that a psychiatrist may not testify to the credibility of a witness; that issue is one for the jury. A leading precedent to this effect is *United States v. Wertis*, 505 F.2d 683, 685 (5th Cir.1975), *cert. denied*, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697 (1975): In that case, the Court said:

> Wertis' final complaint which merits brief discussion is that the court erred in refusing to permit a psychiatrist to opine whether a principal prosecution witness "... would ... have a tendency to be reliable as a witness in distinguishing the truth from non-truth, realities from fantasies...." Such a question as that proffered is beyond the competence of any witness. Peeled of its thin veneer of jargon, it amounts to no more than an inquiry whether the witness is to be believed by the jury or not.

The opinion in that case had already been foreshadowed by *United States v. Barnard*, 490 F.2d 907, 912–13 (9th Cir.1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), decided before the adoption in 1975 of the Federal Rules of Evidence. There a psychiatrist and a psychologist had been called to testify on the reliability of Dillon, a co-defendant who had turned State's evidence as a witness. The two experts had read psychiatric evaluations of Dillon and his grand jury testimony and had observed some of his trial testi-

mony, in all medical probability, given the circumstances at hand.

mony. Both were offered by the defense as witnesses to testify that, "[o]n the basis of this familiarity," "Dillon was a sociopath who would lie when it was to his advantage to do so." The trial judge ruled such evidence inadmissible. The circuit court affirmed, saying:

As we have seen, competency is for the judge, not the jury. Credibility, however, is for the jury—the jury is the lie detector in the courtroom. Judges frequently instruct juries about factors that the jury may or should consider in weighing the veracity of a witness.... It is now suggested that psychiatrists and psychologists have more of this expertise than either judges or juries, and that their opinions can be of value to both judges and juries in determining the veracity of witnesses. Perhaps. The effect of receiving such testimony, however, may be two-fold: first, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is collateral but still an important matter. For these reasons we, like other courts that have considered the matter, are unwilling to say that when such testimony is offered, the judge must admit it.

Again, in *United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.1979), *cert. denied*, 444 U.S. 885 and 969, 100 S.Ct. 179 and 460, 62 L.Ed.2d 116 and 383, the court reiterated its decision in *Barnard, supra,* adding:

Under the Federal Rules, opinion testimony on credibility is limited to character; all other opinions on credibility are for the jurors themselves to form.

*See to the same effect: United States v. Azure,* 801 F.2d 336, 339–41 (8th Cir.1986); *United States v. Samara,* 643 F.2d 701, 705 (10th Cir.1981), *cert. denied,* 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104; *United States v. Provenzano,* 688 F.2d 194, 203–04 (3d Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634; *United States v. Jackson,* 576 F.2d 46, 49 (5th Cir.1978). For a discussion of State cases applying the same rules as those in the Federal cases, *see State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73, 75–77 (1986).[5]

Without further discussion, it seems clear that the district court did not abuse its discretion in refusing to admit into evidence the opinions and the "Certification" of Dr. Kuvin, both because the Government was denied the opportunity for a *voir dire* hearing on the qualifications of Dr. Kuvin and the opportunity to cross-examine the psychiatrist at such *voir dire* hearing as required under our opinion in *Gillis, supra,* and guaranteed under Rule 705, and because an opinion on the credibility of a witness by a psychiatrist is not allowable. Without the "Certification," all the evidence with reference to the 12.2 notice, as well as the notes attached, lose relevance on Creswell's credibility in 1983, and the district judge did not err in refusing to admit such evidence, and we so hold.

■ It should not be overlooked in this connection that Cecil was actually permitted to offer evidence attacking the credibility and reliability of Creswell's testimony as a witness. In order to attack Creswell's credibility Cecil sought to develop evidence, already touched on by the Government in direct examination, of the various aliases that Creswell had used in the years preced-

---

5. *United States v. Mest,* 789 F.2d 1069 (4th Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 163, 93 L.Ed.2d 102, is somewhat in point. There we were construing the amendment to Rule 704, Fed.R.Evid. and whether that amendment was to be applied retroactively. The amendment provides:

(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a

defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

We held the amendment was to be given retroactive effect. It is true the amendment applies specifically to "defendant" but the rationale of the amendment is equally applicable to one who is a "witness" such as Creswell. *See United States v. Frisbee,* 623 F.Supp. 1217, 1224 (N.D.Cal.1985).

ing his arrest in this case when he had engaged in smuggling and distributing in this country drugs and related materials over a period of some ten or more years. Using these aliases, all of which Creswell freely admitted, Creswell had on various occasions secured driver's licenses or purchased or leased trucks or cars, (falsely under oath), certifying that the alias he was then using was his true name. Similarly, he freely admitted during Cecil's counsel's cross-examination to using his alias rather than his real name in statements in courts in at least two prosecutions. He testified in that cross-examination to his use, in various amounts over a number of years, of marijuana, hashish, cocaine, LSD, peyote, psylicibin, mescaline, and amphetamines. In response to a question by Cecil's counsel, he said he knew that LSD was a psychotomimetic drug, which gave one a psychotic experience, resulting sometimes in hallucinations and delusions. He admitted at the same time that he had hallucinations sometimes after the use of LSD but never any delusions. In addition, mescaline and psylicibin were identified by him in this cross-examination as "also a hallucinogenic" drugs, producing an effect "similar to LSD but less powerful." All of this was intended to put in question whether Creswell's reliability as a witness had been diminished by his use of LSD. In fact, this was one of Cecil's most direct arguments. The circumstances surrounding the purchases of cars or trucks used in the Maryland operation were similarly covered in the cross-examination by Cecil's counsel in an effort to check Creswell's memory and to test his power of recall by pitting his testimony against the records as to the dates when he had purchased the articles or leased the houses and the name he had used in each transaction. Counsel also examined Creswell on the precise dates when he was in court on other charges, presumably again for the purpose of showing possible inadequacies in Creswell's powers of recall and of testing the truthfulness of his testimony. There was no objection to this questioning of Creswell, all of which went to the reliability of Creswell as a witness and was for the jury to conclude whether Creswell was a credible witness in this case.

Unfortunately for Cecil's possible contention of the unreliability of Creswell's power of accurate recall, these inquiries demonstrated a remarkable ability by Creswell to recall the details of events over the years and his answers proved substantially true in all instances. In fact, after two days of testimony by Creswell, including better than a day consumed by Cecil's counsel in a searching cross-examination of Creswell, Cecil's counsel was unable to impeach in any substantial way Creswell's extensive testimony. And, the attempt at rebuttal by Cecil of Creswell's testimony was hardly more than a gesture. So far as the actual record shows, Creswell may have had an extensive involvement in drug and related operations and had used, during such time, various aliases and had never hesitated to give false information, sometimes under oath, to secure under his aliases driver's licenses and to conceal his real identity, but in all these details and in all his testimony relating to the conspiracy represented by this prosecution, Creswell's testimony met the test of complete credibility and reliability and refuted the opinion of Dr. Kuvin that Creswell was incapable of telling the truth.

The remaining two points raised by the defendant Cecil may be quickly dismissed. In refusing to continue the trial in the hope that Dr. Kuvin would be present the next day the district court did not commit error. From the first hearing on the admissibility of Dr. Kuvin's written statements of his opinion on Creswell's emotional condition, Cecil's counsel had been on notice that Dr. Kuvin would have to appear to testify. Despite this warning and the district court's repeated statements that he wished to conclude the testimony on March 28, Dr. Kuvin was not presented as a witness at any time, even though Cecil's counsel had given conflicting statements on when Dr. Kuvin had been subpoenaed for appearance. Not until the testimony was concluding on March 28 did Cecil's counsel state he wanted to use Dr. Kuvin as a witness. He had to admit, however, that,

though he said that Dr. Kuvin was subpoenaed to appear that day (March 28), Dr. Kuvin had told counsel specifically that he would not appear on March 28. Cecil's counsel said that he wanted to have Dr. Kuvin testify to the matters in his "Certification" and asked the court to admit such "Certification" because of Dr. Kuvin's unavailability at that time. After expressing grave apprehension about the admissibility of the opinion expressed by Dr. Kuvin in his "Certification" and after some animated discussions on the conflicting statements about when Dr. Kuvin had been subpoenaed to appear, the district judge denied the request. We find no error under the circumstances. Cecil had had almost a week within which to call Dr. Kuvin. So far as is shown in the record, Dr. Kuvin was not available at any time during that period.[6] Yet, during this period, Cecil's counsel, oddly enough, was seeking to have the "Certification" admitted without presenting Dr. Kuvin, though he was continually assuring the court that Dr. Kuvin was available to testify. On the last day of testimony when the parties were checking the exhibits, Cecil's counsel brought up again that he had another witness, Dr. Kuvin. He first said Dr. Kuvin was subpoenaed for that date. Later he conceded that Dr. Kuvin had been subpoenaed to appear during the earlier part of the week. In any event, Dr. Kuvin was not present or available and it was admitted by counsel that he knew all along that he would not be present. Yet he asked again, because of the witness' unavailability, that the "Certification" be admitted. When that was refused, counsel asked that the trial be continued so that he might have Dr. Kuvin present. Naturally, the district court looked with a jaundiced eye on what had been a fairly obvious effort by Cecil's counsel to "manipulate" the district court into admitting, without any qualification of the witness as an expert and without granting the Government any right to cross-examine the witness, that witness' opinion. We cannot fault the refusal of the district judge to admit the proffered exhibits or to continue the trial.

■ When the district judge refused to admit the "Certification," Cecil's counsel then requested the Court to order a mental examination of Creswell. The Court had previously denied such motion, which would have required an interruption in the trial and which, as the trial judge said, came too late (made only in the midst of trial). He repeated such denial at the end of the trial and we find no error.

Accordingly, we find no merit in the defendant Cecil's claim of error in the refusal to permit the introduction into the record of the two specific evidentiary items on which the district court ruled.

### III.

The defendants' attack on the jury selection procedure followed by the Maryland district courts is equally without merit. Here again it is necessary to recognize the defendants' specific objection to the jury selection procedure involved here. The defendants' attack centers entirely on the use of the current voter registration list (VRL) as the source for the jury wheel from which the random selection of jurors was made under the Maryland plan. Actually, in the affidavit of counsel submitted as the basis for the attack on the use of the VRL, counsel states that "the Plan as implemented probably does provide a cross-section of the registered voters in the State of Maryland but this is not the end of the constitutional or statutory inquiry." They contend that, if allowed access to all the jury selection process in the Maryland District Courts, they can flesh out their objections but that they have been denied access to these records. They sought by motion an order granting such access. The district judge dismissed the motion and ruled that

---

6. In his Reply Brief, counsel for Cecil states that he had told the district judge that Dr. Kuvin was available at any time to testify. He, however, was not available at that time and, so far as the record shows, at no subsequent time. The seeming inference that the failure to call Dr. Kuvin was that of the district court itself overlooks the fact that the calling of witnesses is the responsibility of the party who has subpoenaed the witness, and not the responsibility of the trial court.

the VRL was a proper source from which to select the jury venire in the District Court of Maryland. The defendants have appealed that decision and we affirm.

The use of VRLs as the source for jury selection in federal courts has been expressly sanctioned by Congress in 28 U.S. C. § 1863(b)(2). In so doing Congress obviously recognized that such use would necessarily exclude from jury service those individuals, whatever their race, color, gender, or age, who had not registered to vote, but it determined that this use of the voter registration list or list of voters would meet the constitutional requirement of a "fair cross section" of the community, since no cognizable group would be systematically excluded. This Congressional reasoning was aptly stated by Judge Devitt in *United States v. Hanson*, 472 F.Supp. 1049, 1054 (D.Minn.1979), *aff'd*, 618 F.2d 1261 (8th Cir.1980):

> The use of voter registration lists was chosen by Congress in part because it provided each qualified citizen with an equal opportunity to cause his name to be among those from which random selection is made, and also because it was the largest generally available random source that was frequently updated. *See* H.Rep. No. 1076, 90th Cong., 2d Sess., *reprinted* in [1968] U.S.Code Cong. & Admin.News, p. 1792. The Jury Selection Act was the result of the best thoughts of each of the three branches, *see Simmons v. United States*, 406 F.2d 456, 462–63 (5th Cir.1969), and the Act was lauded and approved in dictum by the Supreme Court in the Sixth Amendment case of *Taylor v. Louisiana*, 419 U.S. 522, 528–30, 95 S.Ct. 692 [696–98], 42 L.Ed.2d 690 (1975). In light of this, to suggest, as defendants do, that the Act's use of voter registration lists violates the Constitution, simply goes too far. *Compare Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (even though Act results in underrepresentation of young people, it does not violate the Sixth Amendment). Of course voter registration lists are imperfect—Indians may not vote as much as non-Indians, Hutterites may not vote as frequently as Catholics, Swedes in the Sixth Division may vote more often than Germans, young people may vote less than old—but this does not render use of those lists unconstitutional, especially considering the alternative, which is to set up a complicated procedure that takes into account the voting habits of all groups in the community, regardless of their size, and then supplement voter lists accordingly. No court has ever required this, and for good reason. The procedures in the Act, despite its imperfections, achieve the goal of the Sixth Amendment: through random selection from voter lists, defendants are assured of a jury pool drawn randomly from a fair cross-section of the community, and the evils of "professional jurors" and the "key man system" are eliminated. Therefore the court holds that the plan utilized in the sixth division is not inherently defective and that defendants have not established a prima facie violation of the Sixth Amendment.

The court in *United States v. Test*, 550 F.2d 577, 587, n. 10 (10th Cir.1976) made the same point:

> ... in adopting the voter registration lists as the "preferred source" of names for prospective jurors, Congress not only intended to provide a relatively large and easily accessible source of names, but one to which all potential jurors would have equal access and which disqualified jurors solely on the basis of objective criteria.

■ After all, the Constitution does not require that the juror selection process be a statistical mirror of the community; it is sufficient that the selection be "in terms of a 'fair cross-section'" gathered without active discrimination. This was made clear in a series of decisions in the First Circuit. In *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir.1985) (*en banc*), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1272, 89 L.Ed.2d 580 (1986), that court laid down the controlling principle in this regard:

> The Supreme Court has never gone so far as to hold that the constitution requires venires to be, statistically, a sub-

stantially true mirror of the community.... While courts often speak in terms of "fair cross section," they have realized that practical reasons, as well as the sterility of such endeavor, militate against total realization of this ideal.... Because a true cross section is practically unobtainable, courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not *actively* prevent people from serving or actively discriminate, and *so long as the system is reasonably open to all.* (First italics in text; second italics added).

In this same circuit, the court, as it later emphasized in *Anaya v. Hansen*, 781 F.2d 1, 4 (1st Cir.1986), "distinguished between deliberate exclusion of jurors and a mere showing, prima facie, of a statistical imbalance" in the VRL's, saying (772 F.2d at 1000):

> If certain people are specifically and systematically excluded from jury duty, then the jury-administrating authority would have created its own group. Clearly, the state has no right to deliberately exclude specific classes or groups from juries without some very special reason. Thus, it may not *forbid* blue collar workers, chess players, Masons, etc. from serving on juries. But if there are, as in the present case, mere statistical imbalances, unexplained, the problem is different.

Later, the same court speaking to the same point in *United States v. Lynch*, 792 F.2d 269, 271 (1st Cir.1986), declared "that a showing of mere statistical underrepresentation, without evidence of actual discriminatory or exclusionary practices" was insufficient to establish "a prima facie violation of the sixth amendment fair cross-section requirement," citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In so providing, Congress recognized that the use of VRL's, which have been compiled in a nondiscriminatory manner as the source for selection of federal juries, necessarily would exclude from jury service those individuals, whatever their color, race, or age, who had not registered to vote. But it determined that such a procedure would not violate the constitutional mandate of the sixth amendment, since no cognizable age group would be "systematically" or intentionally excluded by that procedure.

We accepted this view in *United States v. Blair*, 493 F.Supp. 398, 407 (D.Md.1980), a decision affirmed by us in 665 F.2d 500 (4th Cir.1980). This case, which arose in Maryland as did the case herein, involved exactly the same procedure for selecting the jury venire by reliance solely on the voter registration list as here, and this procedure was objected to on precisely the same grounds as those raised here by the defendants. The court dismissed the objections, saying:

> The use of voter registration lists has been consistently upheld against both statutory and constitutional challenge, unless the voter list in question had been compiled in a discriminatory manner. *United States v. Dellinger*, 472 F.2d 340, 366 (7th Cir.1972); *Wilkins v. Maryland*, 402 F.Supp. 76, 78 (D.Md.1975). Congress recognized that the use of voter registration lists in this manner would exclude from jury service those individuals who do not register to vote. However, Congress concluded that such exclusion would not be unfair since no economic or social characteristic would prevent a person from placing his name on the voter registration list. H.R.Rep. No. 1076, 90th Cong. 2nd Sess., *reprinted in* [1968] U.S. Code Cong. & Admin. News, pp. 1792, 1794–95. Thus, the mere underrepresentation of black males on voter registration lists is not sufficient to establish a violation of the Act or of the Constitution. *United States v. Briggs*, 366 F.Supp. 1356, 1358–61 (N.D.Fla. 1973).

And we have followed this rule as stated in *Blair* in *United States v. Coats*, 611 F.2d 37, 40–41 (4th Cir.1979), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980), and later in *United States v. Espinoza*, 641 F.2d 153, 168 (4th Cir.1981), *cert. denied*, 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125. In *Coats*, we dealt with a

challenge to the jury venire on the ground that the sole pool was the voter list at the most recent election[7] and that such a source excluded all persons who failed to vote in that election. We held that such exclusion was not violative of either the fifth and sixth amendments or the Federal Jury Selection and Service Act. Because of the alternative provision of the Federal Act, we perceive no difference between the effect of exclusion for failure to vote and exclusion for failure to register to vote in determining whether the mandate of the Constitution and Act had been met, when neither the right to vote nor the right to register had been discriminately denied any cognizable group.

In *Espinoza*, the defendant attacked the jury selection process because under the selection of the jury venire Hispanics who represented a cognizable class of persons had been excluded from the jury selection process in violation of the defendant's rights under the sixth amendment. In denying the challenge, the court said (Page 168):

> Persons of Mexican descent may constitute such a class. *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). However, such systematic exclusion must be proven; it will not be presumed. [citing cases] The defendant must show, in order to establish a prima facie violation of the fair-cross-section requirement, "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri, supra* 439 U.S. [357] at 364, 99 S.Ct. [664] at 668 [58 L.Ed.2d 579 (1979)].

It may be true that Espinoza'a trial jury included no Mexican-Americans, but as the above quoted exchanges among the court, the Assistant United States Attorney and Espinoza's counsel clearly demonstrate, the court did not, as he asserts, deny him an opportunity to establish that the absence of Mexican-Americans from that jury was the result of a deliberate policy systematically to exclude them therefrom.

These decisions of our own Circuit conform to the uniform rule adopted in other federal circuits. Judge Gewin, writing on behalf of a Committee "[p]ursuant to an assignment of the Committee on the Operation of the Jury System, said in his Report, a copy of which is included in the opinion in *Foster v. Sparks*, 506 F.2d 805, 816–17 (5th Cir.1975):

> We are aware of no case in which exclusive reliance on voter registration lists has been invalidated. In the only case where it was intimated that supplementation may have been appropriate, the court relied not upon the disproportionate representation of a particular group appearing on the list but rather upon the unlikelihood that a registration list containing only half the eligible voting age population could produce a fair cross section.
>
> The reason for judicial reluctance to treat "substantial deviation" as anything less than a constitutional deficiency is unclear. To speculate, perhaps it can be ascribed to the limited efficacy of data on both registration and voting age populations. *Disparities between the two can frequently be attributed to personal predilection not to register as opposed to state or locally imposed impediments. And courts have uniformly maintained that such predilections cannot form the basis of a cognizable class and evoke judicial sanctions against the selection system.* (Italics added)

█ This conclusion of Judge Gewin has been supported by repeated decisions affirming that the use of the voter registra-

**7.** Section 1863(b)(2) authorizes the use of either "the voter registration lists or the lists of actual voters...."

tion lists as the primary source for the selection of jury venires in federal courts is neither a constitutional nor a statutory violation. For illustrative cases to this effect, *see United States v. Afflerbach,* 754 F.2d 866, 869–70 (10th Cir.1985), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636; *United States v. Warinner,* 607 F.2d 210, 214 (8th Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 760 (1980); *United States v. Brady,* 579 F.2d 1121, 1134 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979); *United States v. James,* 528 F.2d 999, 1022, (5th Cir.), *rehearing denied,* 532 F.2d 1054, *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976); *United States v. Lewis,* 472 F.2d 252, 256 (3d Cir. 1973); *Camp v. United States,* 413 F.2d 419, 421 (5th Cir.), *cert. denied,* 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969); *United States v. Caci,* 401 F.2d 664, 671 (2d Cir.1968), *vacated and remanded on other grounds,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), ("It is well established that the use of voter registration lists as the source of names of prospective jurors is not unlawful because it results in the exclusion of nonvoters"); *United States v. Kelly,* 349 F.2d 720, 778 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), (in which the unbroken line of federal cases in this Circuit to the same effect are cited with the hope that "it will be perceived that the principles of *stare decisis* are … applicable" here); nor has any Circuit Court of Appeals so ruled.

Not only has the use of the voter registration lists been uniformly approved by the Court of Appeals as the basic source for the jury selection process and will not be invalidated because a group chooses not to avail itself of the right to register without any discrimination of any kind, but Congress specifically approved the use of such lists even though it was recognized that persons who chose not to register would be excluded from the jury selection process. Congress manifested this intention in the language of 1968 U.S. Code Cong. & Admin.News, 1794–95, language which Judge Harvey referred to in *Blair.*

The defendants seek to weaken this clear Congressional expression of intent by pointing to other language in Section 1863(b)(2) to the effect that "any substantial percentage deviations must be corrected by the use of supplemental sources." Courts, however, have generally regarded this language to refer to "substantial percentage deviations" arising out of some discriminating practice such as that earlier pursued by the jury commissioners in *Duren* discussed later and has never been understood to refer to any underrepresentation created simply because some members of a class itself had by sloth failed to register. Actually, it is likely that Congress, writing in the midst of the civil rights legislation, was thinking of the possible vestiges of discrimination in registration to vote that might have remained in certain areas and wished to offer some safeguard against that condition by this provision for supplementation. *See* 42 U.S. C. § 1973 *et seq.* Any danger of such discrimination, however, is largely a matter of the past; in any event, it is not suggested that there was any discrimination practiced in Maryland in registration of voters at any time relevant to this prosecution and that justification for finding the voter registration lists in Maryland flawed so as to require supplementation is absent here.

The authorities cited, from practically every Circuit including our own, in many of which certiorari has consistently been denied by the Supreme Court, as well as the legislative intent expressed in the Jury Selection Act itself, as found by the courts, categorically establish that there is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open. This form of jury selection (*i.e.,* by the use of VRLs) cannot be described "as 'systematically' excluding classes that do not register in proportion to their numbers"; it is a process that comports with the "need for efficient jury selection" even though it may not "perfectly reflect population." Nor does it follow that the voter registration lists do not satisfy the fair cross-section of

the population simply because group members of one group neglected to register in the same proportion as was their share in the overall population. The Constitution and the statute do not require such perfection. It is sufficient that the system adopted provides a fair cross-section and we find both common sense and precedent establish that if the voter registration lists do this they are not tainted by some affirmative form of discrimination.

It must be remembered that the Maryland plan which prescribes the use of the voter registration list has been approved in the manner required by the statute by the chief judge and the other district judges of Maryland and by the Judicial Council of this Circuit, 28 U.S.C. § 1863(a); and that plan recites affirmatively the combined judgment of both the district court and of this court that "voter registration lists represent a fair cross-section of the community in the District of Maryland."[8] This is no perfunctory statement of judgment; it is the considered judgment of an impartial group with intimate acquaintance with the population involved and with the constitutional and statutory requirements. In *Waller v. Butkovich*, 593 F.Supp. 942, 958 (M.D.N.C.1984), Judge Merhige, sitting by designation, said in connection with such an approval of a jury selection plan that "[w]hile this [approval] ... is not dispositive, it does suggest that a court should at least have 'some sense of conviction' before declaring that a district's jury selection plan has substantially failed to comply with the fair cross-section requirement." *See also United States v. Hanson*, 618 F.2d 1261, 1267 (8th Cir.1980). We agree with that view.

The defendants, however, posit that lack of fair representation of any "distinctive" or identifiable class or group in the voter registration list used for jury selection renders the list inadequate, requiring supplementation. They would find warrant for this contention in *Duren v. Missouri*,

439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), which relied substantially on the earlier decision of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). We do not deduce any such rule from the decision in either *Duren* or *Taylor*. In fact, we find nothing in either of those decisions which would open to doubt our decisions in *Blair, Coats,* and *Espinoza* or the decisions to like effect from other circuits. And we think a review of those two cases will sustain that view. In support of that view, we look to the decisions in those two cases.

*Taylor* will not long delay us. In that case, women were only included in the jury selection process if they expressly requested to be included; no similar requirement existed in the case of male registrants. No provision for notice to women of this necessity to request inclusion in order to be included on the jury lists was given. The result was the effective exclusion of most women by this method of affirmative discrimination against them in the jury selection process. That procedure is not analogous in any way to the use of the voter registration list where registration is open to all without discrimination of any kind as to sex, race, or color. Actually, as Judge Devitt observed in *Hanson*, the Supreme Court in *Taylor* spoke approvingly of and impliedly counseled the use of the VRLs as the primary source for providing fair representation cross-section for the jury selection process. 419 U.S. at 538, 95 S.Ct. at 701. *Taylor* accordingly offers no support for an argument impugning the propriety of the sole use of the voter registration lists as the primary source for jury selection.

*Duren* is equally not in point. There is not one word of criticism of the use of the voter registration lists in the opinion in that case. In fact, the Court expressly stated it found nothing objectionable in the use of the voter registration lists as the sole source for ascertaining the initial group from which the jury venire would be

---

8. Were it not that the appellants have included this conclusion in their affidavit presented to the court we could properly take judicial notice of this finding by the courts. *United States v.*

*Hawkins,* 566 F.2d 1006, 1008, n. 2 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed. 2d 151 (1978).

drawn. The Court knew that the lists did not include members of any class who had not registered to vote, and it no doubt knew as well as the writer of the Census monograph, quoted by the appellants in their motion, the percentage of women on the voter registration lists. Despite this, the Court said: "There was no indication that underrepresentation of women occurred at the first stage of the selection process—the questionnaire canvass of persons randomly selected from the relevant voter registration list." 439 U.S. at 366, 99 S.Ct. at 669. The court proceeded to add that the "first sign of a *systematic* discrepancy [as noted by the Court in this case] is at the next stage—the construction of the jury wheel from which persons are randomly summoned for service." (Italics added). At this "stage," women whose names had been drawn from the list were given "another opportunity to claim exemption," and—this is the important point—the jury commissioner presumed the failure of a woman to claim an exemption to be a claim for exemption and the names of those women who failed to register were removed from the list. No similar rule applied to male registrants. As a result of this discriminatory action on the part of the jury commissioner, the record demonstrated that there was created a large disparity in the representation of women on the actual jury venire, which "occurred not just occasionally, but in every weekly venire for a period of nearly a year," thereby indicating "that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." 439 U.S. at 366, 99 S.Ct. at 669. We repeat: It was not the use of the voter registration list as the sole source for the threshold ascertainment of the group from which the jury venire was to be selected that was faulted; it was the use by the jury commissioners of an impermissible presumption to exclude a large number of women at the next step in the preparation of the jury wheel that prompted the Court's disapproval. There is then nothing in the *Duren* decision that could be said to deal with the question whether the voter registration lists may require supplementation merely because of the failure of the lists to include sufficiently the names of those in the appropriate age or racial group who had failed to register, and we regard any effort to read such a ruling in the decision error.[9]

As a matter of fact, we do not understand the defendants to suggest that there is any explicit language in any Supreme Court decision that declares that the voter registration lists may be declared invalid as the primary source in the jury selection process because members of one cognizable class have failed to register in the same proportion as other cognizable classes. In effect, the defendants would deduce that such rule is *"clear"* because they say in *Duren* the Supreme Court found there to

9. This construction of the decisions in *Taylor* and *Duren* is similar to that stated in the Note on the Missouri decision in *Duren* in 47 UMKC L.Rev. 246, 254 (1978):

Under the Missouri court's decision in *State v. Duren,* the female exemption system held unconstitutional in *Taylor v. Louisiana* was substantially different than the system utilized in Missouri. Under the Louisiana system, a woman was required to "opt on"; the court would not add her name to the jury wheel until she had filed a written declaration indicating her desire to serve. Under the Missouri system, women may "opt off." There is no difference between the questionnaires sent to prospective male and female jurors. The difference lies in the fact that women are clearly notified by the questionnaires that they may, for no cause and at their option, decline to serve at any time before being sworn onto the jury and that men are not given this option. The Missouri court concluded that because Louisiana women had to volunteer before they were put on the jury list, this resulted in the effective exclusion of females. If a woman in Jackson County does not return her questionnaire, her name is automatically added to the jury wheel. However, if that woman's name should be drawn from the wheel and she still does not respond to her summons to jury duty, the commissioner will presume that she has exercised her option not to serve. The end result of the Missouri system, therefore, is the same as that under the Louisiana system. Women in either system, unlike men, are required to take some affirmative action—either mailing in a request to be added to the list, as in Louisiana, or mailing in a questionnaire and/or summons, as in Missouri—before they can be selected for jury service.

have been affirmative discrimination in the *subsequent* use by the jury commissioners of the voter registration list in the sequential development of the jury venire through the development of a presumption which prejudiced the selection of women appearing on the voting list. The ruling in *Duren* does not make "clear" the rule the defendants would deduce from it. And in this conclusion, we find confirmation in the ruling made by Chief Justice (then Justice) Rehnquist, sitting as a single Justice, on a motion to stay in *California v. Harris,* 468 U.S. 1303, 105 S.Ct. 1, 82 L.Ed.2d 807 (1984). In *Harris,* it was argued in favor of the motion to stay that the opinion sought to be stayed had held that it is "a violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class because of the failure of class members to register to vote." Chief Justice Rehnquist did not construe the decision of the State Court to hold, as argued by the movant, and denied the motion for a stay. But he added after reaching that conclusion, lest there be any misunderstanding of his decision—and this is the important language so far as we are here concerned—that had he thought the State Court had so held, he would have "grant[ed] a stay, because I think four Members of our Court would probably vote to grant certiorari to review the issue," explaining

> Whether this sort of jury selection procedure can be described as *"systematically"* excluding classes that do not register to vote in proportion to their numbers, and whether the need for efficient jury selection may not justify resort to such neutral lists as voter registration rolls even though they do not perfectly reflect population, *see* 439 U.S. at 368–370 [99 S.Ct. at 670–72], are by no means open and shut questions under *Duren.* (Italics added).

We take it to be "clear" from this statement of Chief Justice Rehnquist that nei-ther *Duren* nor *Taylor*—or, for that matter, any other decision of the Supreme Court—supports the view espoused by the defendants that a jury selection process which uses as its primary source solely a voter registration list, which has underrepresentation of a cognizable class arising from the failure of its members to register to vote in sufficient numbers but not because of any "systematic" exclusion of such a group, will not satisfy the constitutional and statutory jury cross-section requirements. Further, *Duren* has not been construed by other courts of appeals as establishing any such rule as that urged by the defendants.

In summary, as a matter of law, the construction of the defendants of Section 1863 and the constitutional mandate in this matter is contrary to established precedent and the challenge of the defendants to the use of the voter registration list in this case, because members of a cognizable class were not adequately represented in the jury selection by reason of the failure of members of that class to register, should be dismissed as a matter of law. Even were it to be considered that a substantial underrepresentation of a cognizable group on the voter registration lists because of the failure of members of such group to register may be a ground for requiring supplementation of such list—a conclusion which flies in the face of all precedent and violates Congressional intent—the appellants have not made a proper showing of such underrepresentation to support a showing of that character. As the Court said in *United States v. Bennett,* 539 F.2d 45, 55 (10th Cir.1976), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293, "the supplementation of voter lists is the exception, not the rule, and absent a showing of deficient representation the use of an approved jury selection process is lawful."[10] And to make such a showing the challenger of the selection process must by affidavit set forth "a sworn statement of facts

---

**10.** *See also United States v. Hanson, supra,* 618 F.2d at 1267, quoting from *United States v. Freeman,* 514 F.2d 171 (8th Cir.1975):

the voting lists must be supplemented to obtain jurors from a fair cross section of the community only "where obstacles are placed in the paths of certain citizens attempting to register to vote."

which, if true, would constitute a substantial failure to comply with the provisions" of the Jury Selection Act. 28 U.S.C. § 1867(d); *In Re Shriner,* 735 F.2d 1236, 1241 (11th Cir.1984); *United States v. Goodlow,* 597 F.2d 159, 162 (9th Cir.), *cert. denied,* 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979); *United States v. Smaldone,* 485 F.2d 1333, 1346–47 (10th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). The facts stated in the affidavit in this case, such as they are, are not sufficient on their face to support an invalidation of the sole use of such lists. At the outset it should be noted that the statement of facts in the affidavit is by and large on information and belief and, in many instances, is couched in conclusory language. The source for such allegations of fact as there are in the affidavit is identified as official census figures or studies of such official census reports or of the voter selection plan under challenge itself. It justified this reliance on census figures and calculations on the correct contention that courts may take judicial notice of official governmental reports and statistics. Fed.R.Evid. 902(5); Louisell and Mueller, *Federal Evidence* § 533. The review of the affidavit must be made with these facts in mind.

Mr. Horn's affidavit begins with the allegation on information and belief that the grand jury which indicted the appellants and the petit jury to be impaneled were to be selected "from only the voter registration lists of the State of Maryland ('VRL') and not from any other source." [11] The affidavit then details the procedure followed in selecting grand and petit jurors from this single source (VRLs) under the Maryland plan. He concedes, as he states in his affidavit, that *"based on what I have learned I think that the implementation of the Plan does provide 'randomness' relative to the VRL. In other words, the Plan as implemented probably does provide a cross-section of the registered voters in the State of Maryland but this is not the end of the constitutional or statutory inquiry."* The affidavit follows with the claim that the VRL in question includes but 60% of the State's population 18 years of age and older entitled to vote. With specific reference to blacks in Maryland, it states that 20.82% of the total Maryland residents are blacks 18 years or older and that "based on census information and studies, black Maryland residents will be substantially underrepresented on the VRL" and their underrepresentation will be due to their "systematic exclusion in the jury selection process (systematic in that it is inherent in exclusive reliance on the VRL, at least in a state with a large black community such as Maryland)." The same charge of underrepresentation is made in the affidavit in connection with persons ages 18 to 34 and the same claim of "systematic exclusion" as that stated for black residents. The studies and census information on which the affiant predicates his claim of "systematic exclusion" is apparently a Bureau of the Census monograph issued in 1973 which includes this statement quoted in the affidavit:

> Higher levels of registration and voting were associated with persons who were male, white, those in the middle-age group (35–64), those persons with at least a high school diploma, those in families with incomes greater than $10,000, and those in white-collar occupations. Conversely, females, negroes, persons of Spanish ethnic origin, the youngest (18–34) and oldest age groups (65 or older), those who did not complete elementary school education, those in families with incomes less than $5,000 and those in unskilled occupations, such as laborers and private household workers, were less likely to be registered and vote.

It is odd that the affiant has based his affidavit setting forth these figures on census reports for the years prior to the 1980s. The appellants were tried in 1983 and there

---

11. The so-called affidavit of Mr. Horn is, to say the least, unusual. It was not executed by Mr. Horn; it was executed by an attorney who worked for Mr. Horn, Robert Lloyd Rubinstein. In explaining why he and not Mr. Horn executed the affidavit, Mr. Rubinstein said: "Mr. Horn is not in Los Angeles at this moment and I have read the foregoing, know its contents, and make the identical declaration."

is a census report for 1983 showing registration to vote as of November 1982. This case is not to be decided on a Report dealing with 1980 voter registration lists but on the use of the 1982 voter registration list in the preparation of the jury pool.[12] The 1982 Census Report on Maryland's voter registration list is in our opinion the proper Report to consider in this connection. This Report shows that in the election in November 1982, the percentage of those of voting age who had registered to vote in Maryland was 65.7%. This compares favorably with the national average of 65.6%. The percentage of all registered, divided between white and black registrants, was 67.5% white and 61.4% black registrants. A comparison of black registrants in Maryland with that nationally is similarly favorable to Maryland. In Maryland the percentage of blacks registering to vote was 61.4% of the available population, while the percentage of blacks so registering nationally was 59.1%. Significantly, the percentage difference between black and white registrants was the same for both Maryland and for the nation as a whole. If we go further to review other information in the Census Report, we perceive no clear pattern nationally of substantial underrepresentation of blacks in voter registration. Thus, in Louisiana, blacks had registered in greater proportions than whites. In New York, however, the proportion of blacks who had registered to vote was 45.2% and of whites 59.5%, or a difference of 14% roughly. In South Carolina, on the other hand, the difference in registration between the two is barely over 1%. In Missouri, California, Wisconsin, and Illinois,

blacks are registered to vote in greater proportion than whites.

We have detailed at some length these figures because they disprove entirely the appellants' claim that the discrepancy between black and white registrants to vote in Maryland give any support whatever for the appellants' claim that there is such substantial disparity in voter registration by blacks as to show gross underrepresentation of that group in the Maryland registration lists. And it is substantial underrepresentation which must be shown. Neither the statute nor the decisions provides any particular formula for determining whether there is a substantial discrepancy or not. Judge Gewin states that the United States Commission on Civil Rights proposed that "any disparity of 20% or more between the proportion of eligible whites selected for master jury wheel and proportion of eligible minority persons selected be remedied by supplementation." 506 F.2d at 818. Under this test the voter registration list in this case would not require supplementation since the number of black registrants substantially exceeded the 80% test. The result would be similar under any test identified in Judge Gewin's remark or any test discussed by Judge Harvey in *Blair*, at 408. It is clear, then, on its face, the appellants' showing does not indicate "substantial" underrepresentation of blacks on the Maryland voter registration lists.

The appellants proceed to advance the argument that there are more registered automobile drivers in Maryland than there

12. The fallacy in relying on 1970 voter registration and voting lists is well illustrated in certain census figures released by the Census Bureau on October 6, 1987, as summarized in *The Washington Post* p. A3, October 7, 1987:

According to the Census Bureau survey, young blacks, defined as those ages 18 to 24, trailed their white counterparts in voter turnout by about 10 percentage points until 1978, but their participation rose from 20 percent that year to 25 percent in 1982 and 1986. At the same time, turnout of young whites dropped from 24 percent in 1978 to 22 percent last November, the survey said.

Meanwhile, the gap between overall turnout of black voters and white voters was the smallest ever recorded—3.8 percent, compared to a 10-point difference in 1980. The turnout was 47 percent among whites, 43.2 percent among blacks.

"It's important because it tells you how much the country is changing," Garin said. "Black turnout used to be so much lower that there was a discount factor in assessing its impact. Nobody can discount it anymore."

It is obvious from this Census Report that there is no basis in fact for any assumption that voter registration or voter registration lists are disproportionately slanted against blacks generally or black youths in the 18–24 year group specially in the 1980s, as contended by the defendants.

are registered voters and that such lists should be blended with those of voter registration on some basis to achieve an acceptable cross-section representation in the jury selection process. The important point in this regard is that the appellants nowhere suggest that blacks are disproportionately represented as between whites and blacks, measured by their representation in the overall population, on the driver-licensed list. It seems fair for us to assume that whites are overrepresented on such driver registration list. In any event, there is no assurance that blacks will be represented more proportionately on those lists than on the voter registration lists. We question that the appellants' proposal is superior in fairness to the procedure recommended by Congress and approved by this court itself for the district courts of Maryland. Judge Gewin has said in this connection, the hearing on the Jury Selection Act established that of all suggested sources for the selection of the jury wheel none was "free from all difficulty" and did not have "substantial shortcomings" "except for voter registration lists." 506 F.2d at 818, n. 2. In any event, there is no justification for looking to the driver registration lists rather than to the voter registration lists, and attempting to find what Congress, in its consideration of the Voter Selection Act, did was inadequate.

Indeed, this very suggestion of the appellants for the use of driver registration lists demonstrates the confusion and administrative nightmare that will result from following the argument of the defendants. Unquestionably, if defendants prevail, criminal defendants will present the trial courts with all kinds of imaginary new methods of substituting this or that list for the voter registration list, always arguing that their list is superior to the voter registration list. Furthermore, the Census Report which the appellants cite identifies a substantial number of additional "cognizable classes" which it states were in *the late 60's* underrepresented on the voter registration lists because members of such class had neglected to vote. These and many groups other than those named in this Report could be probably named. To determine whether such classes were so underrepresented would be a formidable undertaking. Moreover, such challenges would make for interminable delays in trials and great waste of judicial time. This was the very kind of administrative inefficiency that Chief Justice Rehnquist adverted to in his *Harris* opinion.

We cannot conclude without expressing our anxiety over the disturbing, almost devastating, effect approval of defendants' claim in this regard would have on the orderly and efficient conduct of criminal trials and the excessive burden it would place on the trial courts in this Circuit. We are reasonably confident that every jury plan in this Circuit, as well as those in most of the other Circuits, provides for the use of voter registration lists in the jury selection process. All these plans have been approved, as satisfying the fair cross-section requirement of the statute and the Constitution. We are equally confident that the same disparity that the defendants purport to find in this case will, therefore, exist throughout the Circuit and every future prosecution in this Circuit will be open to the same challenge as that raised here. Moreover, if underrepresentation of a cognizable class could be found in various classes identified in the Census monograph quoted in Mr. Horn's affidavit, ("females, negroes, persons of Spanish ethnic origin, the youngest (18–34) and oldest age groups (65 or older) because they had failed to register, those who did not complete elementary school education, those in families with incomes less than $5,000 and those in unskilled occupations, such as laborers and private household workers"),[13] the opportunities for a criminal defendant to stymie the orderly jury selection process could render the efficient administration of criminal trials in this Circuit difficult beyond measure. To sustain the defendants on this point would put in jeopardy the operation

13. Unquestionably, the ingenuity of counsel will conjure up any number of other alleged "cognizable" groups entitled to fair representation. It should not be anticipated that the challenges to the jury system would be confined to claims only by the groups listed in the Census Report.

of criminal trials in this Circuit with disastrous effect on the enforcement of the criminal laws.

The jury selection process has already become in many instances a nightmare of delays and confusion for the courts. Jury selection, mired down with all sorts of objections, has on occasion taken on a more important part in the proceedings than the guilt or innocence of the defendant. Not infrequently the selection process consumes far more time of the court than the actual trial of the case on the merits. The contention of the defendants if upheld could introduce into the jury selection process another new instrument for obstruction, delay and confusion, wasting in most instances judicial time and making a mockery of orderly judicial procedure.

For reasons given, we conclude both as a matter of law and on the facts (such as they are) in the affidavit, the challenge to the jury selection process in this case is without merit. The voter registration list used in this case complied both as a matter of law and on the undisputed record with the fair representation requirement for jury selection. Since this fact is indisputably established by established governmental reports and statistics and there was no need for the district court to have engaged in a fruitless examination of the Maryland jury procedure followed in federal courts of that state, and any claim by the defendants of a need for such an inquiry is a manifestly dilatory tactic to harass the trial court with a useless inquiry and to delay trial, we have no hesitancy in affirming the dismissal of this motion of the defendants.

It follows that the challenge of the defendants to the jury selection process in this case is without any merit.

### IV.

■ The defendant Hayes questions the sufficiency of the evidence convicting him under count one charging a conspiracy to possess hashish with intent to distribute in the United States. We agree with the district court that the evidence was sufficient. Hayes was a member of a five-man all-American crew, recruited and brought at considerable expense to Cyprus for the purpose of outfitting a river and lake boat to take cargo off the coast of Lebanon across the Mediterranean Sea through the Straits of Gibraltar into the Atlantic where it was to rendezvous with an ocean-going vessel somewhere off the coast of Portugal and near the Island of Madeira. As a preliminary to the trip, the name of the boat and its registration were changed. Also, extensive repairs were made to the boat after it sailed from Cyprus to Piraeus in Greece. When finally repaired, the ship headed to a point about 15 to 18 miles from Beirut, Lebanon. There the boat was met by two smaller boats which brought from Lebanon 18 tons of hashish. Hayes participated in transferring this hashish from the small boats to the boat of which he was a member of the crew. After taking on the hashish, the boat with Hayes and one of its small crews proceeded across the Mediterranean Sea through the Straits of Gibraltar into the Atlantic Ocean. This trip involved some weeks. During this time, the crew pilfered some of the hashish and smoked it constantly on the voyage. There is no direct evidence that Hayes himself smoked any hashish on the trip but it is obvious he saw the others smoking the hashish. Further, there is no evidence that Hayes actually discussed the cargo and its destination with others on the voyage but it is inconceivable that the crew, including Hayes, did not talk and know the purpose of the trip or the cargo they were transporting.

When the boat on which Hayes was a member of the crew had rendezvoused with the ship from the United States in the Atlantic, Hayes assisted in transferring the hashish to the ocean-going vessel. The transfer was made because the boat on which Hayes served was not capable of crossing the ocean and the other ship had been brought over from Maryland to make the crossing. Hayes manifestly knew this. All the crew in the ocean-going ship were Americans. Obviously the ship had come from the United States and it was heading back to the west. Hayes and everyone involved had to have known that the whole operation was one beyond the law. Other-

wise, the first ship would not have avoided taking on its cargo in port in the normal way but had taken on its cargo at sea clandestinely under circumstances where its movements would not be observed. The transfer at sea from the first ship to the second ship of what Hayes and those with him knew was hashish more than justified the inference that Hayes knew that the hashish was going to be smuggled into some place in the west. The ocean-going vessel came from the United States and it was reasonable to assume that the boat was returning there with its crew. Certainly, the clandestine, byzantine nature of the whole transaction, conducted and heavily financed by Americans, all pointed towards the conclusion that the object of the whole operation was to smuggle hashish into the United States and Hayes' participation in the operation was a part of the smuggling.

We find the evidence more than sufficient to sustain Hayes' conviction.

## SUMMARY

In summary, we find, first, no error in the district judge's ruling refusing to admit in evidence the opinions and "Certification" of Dr. Seymour Kuvin as a foundation for cross-examination of Creswell, as well as the 12.2 Notice filed by Creswell's counsel in a case in the Eastern District of New York. Neither do we find any error in the district court's refusal to continue the case in order to provide a further opportunity for Dr. Kuvin to appear and be examined or to order at the end of the trial a psychiatric examination of Creswell. We thus dismiss the defendant Cecil's individual claims of error in these rulings. Secondly, we dismiss as without merit the challenge by all the defendants to the use of the Voter Registration List of Maryland for use as the sole source for a random selection of the jury panel herein. Finally, we find no error in the district court's denial of the defendant Hayes' motion for a directed verdict and affirm his conviction. The result of these rulings is that all convictions herein are

AFFIRMED.

PHILLIPS, Circuit Judge, concurring in part and dissenting in part:

I concur in Part IV of the majority opinion which affirms Hayes' conviction. I dissent from Part II, which rejects Cecil's claim of prejudicial error in the district court's refusal to allow cross-examination of Creswell respecting his aborted insanity plea; and from Part III, which rejects the several defendants' claim of error in the district court's summary denial of their fair cross-section challenge to the jury array.

I take the refusal to allow cross-examination and jury challenge issues in that order.

### I

It is hard to imagine evidence—other than directly exculpating evidence—more critical to a criminal defendant's defense than evidence that a key witness against him is not credible on the matters in issue because of a mental impairment affecting his powers of recall or general reliability. For this reason, despite the obvious added risks of embarrassment and distress to the witness, the rule is that under appropriate circumstances such evidence may be admissible, either by cross-examination of the witness or by independent proof or both. *See United States v. Lopez*, 611 F.2d 44 (4th Cir.1979). Whether, assuming relevance, mental impairment evidence should be admissible in a particular case, given its special risk of prejudice to a witness, is of course committed in the first instance to the discretion of the trial judge, operating under the general guidance of Fed.R.Evid. 403, of which the *Lopez* rule is simply a special application. Under Rule 403, such evidence, like any, "although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." *Lopez*, emphasizing the special added danger of unwarranted prejudice to the *witness* posed by this type evidence, requires that in exercising discretion in this context, account be taken of whether the asserted

impairment existed during the period in issue, whether the impairment went to the witness' competency and ability to recall, and whether its revelation would introduce a confusing collateral issue that would require allowing the Government to introduce explanatory evidence. *Id.* at 46. And as a further safeguard, *Lopez* requires that a party seeking to introduce such evidence by any means, make a preliminary offer of proof of the mental impairment evidence, in order to lay a threshold basis for the court's discretionary ruling. *Id.* Obviously, a ruling against admission is then reviewable only for abuse of discretion, with all that that implies for great deference to the trial court's special role and competence in such matters. *Id.*

So, we start with the proposition, which I readily accept, that solicitude for privacy interests and for trial efficiencies give trial courts great latitude for excluding this type evidence. Nevertheless, I am persuaded that under the special circumstances of this case, discretion was abused here; that Cecil should have been allowed to attempt the limited impeachment by cross-examination that he ultimately sought to make, and that disallowing it denied him the fair trial to which he was entitled.

To start with, any evidence significantly probative of this particular witness' lack of credibility was absolutely critical here. As the majority opinion concedes, not only was Creswell a key witness against Cecil, he was the only witness whose testimony directly linked Cecil to the conspiracy; there was little, if any, circumstantial evidence. Effectively, Cecil's defense was that Creswell's testimony, the only significant evidence against him, was too unreliable to persuade a reasonable fact-finder of guilt beyond a reasonable doubt. And, as bearing directly and heavily upon this, Cecil had indisputable evidence, properly proffered to the court, that Creswell had within the past two years asserted, officially and publicly, that within three years of the events to which he testified he had indeed been mentally impaired—so impaired that he himself should be relieved of criminal liability in another matter. The district court's ruling, or series of rulings, effectively denied Cecil

the opportunity to lay any of this critical impeachment evidence before the jury.

The district court's discretion was wide here, but with liberty at stake on the credibility of this single, indisputably criminal, obviously erratic and self-interested witness, I would hold that it was abused here in not allowing Cecil the limited proof that he ultimately sought to make on the matter.

Because trial court discretion depends upon circumstance, it is important in reviewing its exercise to get the context right. And on this, I simply disagree in critical respects with the majority's reading of the record.

On the majority's view, the ruling under review was precipitated in mid-trial by a belated proffer of proof by Cecil which could have been made much earlier. It is then asserted that what Cecil wanted at that point was to introduce the psychiatrist's contemporaneous certificate and his 1981 letter reports filed in the aborted New York insanity plea proceeding as direct evidence of Creswell's present mental impairment, and to offer the psychiatrist as a live witness for the same purpose. The majority then goes to great pains to demonstrate the inadmissibility of the current "certificate" and the 1981 reports; to question whether the psychiatrist was in fact available as a live witness; and to deride—apparently on medical grounds—the probative value of the psychiatrist's opinions, as reflected in the documents, of the narcissistic nature and Oedipus-complex origins of Creswell's impairment. On that basis, the majority then concludes that the only evidence actually excluded by the district court was the record of the Rule 12.2 proceeding in the New York prosecution, which included the psychiatrist's contemporary reports, and the psychiatrist's current "Certification"; that the district court was never called upon to make any wider ruling excluding "all testimony, cross-examination and argument" related to Creswell's mental condition, as Cecil asserted on appeal; and that because neither of the only two proffered items of documentary evidence was admissible, there was no error in the

limited ruling which only excluded them. Majority op. 1438, 1444.

With all respect, this misreads the record in ways critical to a proper assessment of the district court's discretionary ruling.

In the first place, the ruling was not precipitated by a belated effort by Cecil to get the evidence in, but by the government to keep it out. The critical information, the linchpin evidence, was that Creswell had in fact given official notice in 1981 of his intention to enter an insanity plea and had then undergone psychiatric evaluation which tentatively supported his plea. This fact was discovered by defense counsel and communicated to the government, which claims not then to have known of it, well in advance of the government's use of Creswell as a witness. *See* J.A. 231, 232, 251.[14] Cecil's counsel obviously was under no obligation to do more than tell the government, "we have this information, here is the proof in documentary form; be suitably advised," by way of laying a basis for making whatever use of it might be appropriate and permitted at trial. It defies belief, and the government does not represent, that it only became aware at midpoint of trial that Creswell might be cross-examined on the point. Yet its motion in limine to suppress the evidence was only brought on for hearing just before (or possibly after) it put Creswell on the stand. *See* J.A. 217, 218. To the extent that discretion to exclude the evidence might properly take into account the lateness of the issue's raising by defendant—as the majority suggests—any tardiness here simply could not be laid to Cecil.

Much more critically, the majority opinion, with all respect, is simply wrong in its assertion that the district court's exclusion-

ary ruling was effectively limited to the two documentary items incorporating psychiatric evaluations and that this was the limit of the defendant's proffer of proof. In fact, by a series of rulings the court did—as Cecil rightly asserts—ultimately exclude any and all evidence, whether documentary or testimonial, whether to be adduced on cross or direct examination, having to do in any way and to any extent with the fact that Creswell had given notice of intention to file an insanity plea. As indicated, the process of exclusion was an evolving one over the two day period devoted to the government's motion, but its ultimate scope and its effect was unmistakably total exclusion. Most critically, it excluded all opportunity to conduct *any* cross-examination on the point, which was the only means for developing it actually sought from start to end by Cecil.

The government's formal motion in limine was directly addressed only to the anticipation that defense counsel would cross-examine Creswell about the 1981 insanity plea notice and the related psychiatric evaluation. J.A. 207. It was only to the possibility of cross-examination based upon defense counsel's known knowledge of the indisputable facts of that proceeding that the government sought an exclusionary ruling. J.A. 209. The thrust of the government's initial oral argument in support of its motion was only to forestall cross-examination based upon defense counsel's knowledge. J.A. 220.

At this point, defense counsel had made no proffer of evidence pursuant to the *Lopez* requirement. It was only to meet that requirement that Cecil first proffered the two documentary items—as substantiation for the propriety of allowing this potential-

---

**14.** It is not clear from the record just when Cecil's counsel advised government counsel about Creswell's aborted insanity plea in the New York proceedings, but it was obviously not a bombshell dropped in mid-trial as the majority implies. Majority op. 1434. In Cecil's brief on this appeal, it is asserted that notice was given an Assistant United States Attorney by letter back in 1981 (even before indictment), Appellant's Br. 10, and this is nowhere questioned. The record itself shows that Cecil's counsel had provided the government with cop-

ies of the New York insanity plea proceedings approximately a week before Creswell began to testify, J.A. 251. In any event, and for whatever relevance it has, it is not accurate to suggest, as the majority opinion does, at 1434, that the evidentiary issue was first "raised" by Cecil during trial, and that the government only made its motion in limine in response to this sudden development. Actually, of course, Cecil did not "raise" the admissibility issue with the court; the government did, on the basis of information sometime earlier supplied it by Cecil's counsel.

ly embarrassing and possibly collateral matter to be explored *on cross-examination.* Cecil obviously would have seized at that point upon any opportunity given him to supplement his cross-examination by introducing on direct either the documentary evidence or the psychiatrist's oral testimony. But his opposition to the government's motion in limine specifically sought only to protect his right to cross-examine on the basis of the information known both to him, and through him, to the government, and he never at that point sought a ruling admitting the documentary evidence, though he offered to put the psychiatrist on for voir dire if the court desired. J.A. 266, 278.[15] In fact, as consideration of the motion continued, Cecil emphasized again and again the narrow scope of cross-examination he proposed and would bind himself in advance to conduct. He would limit it to two to three minutes duration and would seek by it basically only to bring out that Creswell had indeed given notice of an insanity plea in the New York proceeding, and then to pursue the inevitable admission only in severely limited ways. He specifically proposed to explore only the extent to which Creswell had participated with his counsel in the decision to give notice of the insanity plea, to explore Creswell's recollection of the nature of the psychiatric evaluations then made, to inquire whether Cres-

well considered himself to have been mentally impaired at that time and subsequently. *See* J.A. 235, 266, 267, 285.[16] He specifically disavowed any purpose to introduce in evidence either the psychiatric reports or the psychiatrist's oral testimony. J.A. 278. When the court expressed concern about opening the door to comparable cross-examination by Cecil's co-defendants, counsel for those defendants expressly waived any right to do so. J.A. 287.

Cecil's counsel also expressly identified and committed himself to limit the arguments he would make based upon any evidence developed by this limited cross-examination. He proposed to exploit it only by arguing alternatively that Creswell was either honestly doubtful about his mental condition in the relatively recent past, or was prepared then deliberately to misrepresent his condition in order to manipulate the judicial process. J.A. 224–25. He expressly committed not to argue that Creswell was insane—at any time. J.A. 287. In this light, it is significant that Cecil's proffer identified a quite legitimate impeachment purpose as an alternative to mental impairment. The district court first tentatively, J.A. 260, then finally, J.A. 290–91, refused to allow cross-examination touching on the insanity plea for any purpose, no matter how limited.[17]

---

**15.** The majority points out that after all the evidence, including Creswell's testimony, was in, Cecil sought to be allowed to call the psychiatrist as a witness, or, failing that, to put his "certification" in evidence; and the majority for some reason then questions whether the psychiatrist was available even then. In total context, it is obvious that at that late point, having been denied the critical right to cross-examine Creswell, Cecil's counsel was simply protecting the record. The district court had already ruled that no evidence, whether by cross- or direct examination, on the matter of Creswell's insanity plea notice would be admitted.

**16.** A succession of scope-limiting proffers appear at each of the referenced pages of the Joint Appendix. The final comprehensive one, which may be taken as the subject of the court's ultimate exclusionary ruling, was in these words:

> I am going to ask him whether or not he participated in his defense with his lawyer. Whether he was concerned with the case against him. Whether he saw the correspon-

dence that was sent in his behalf. The declaration is filed in his behalf. Whether he consulted and agreed with the activities of his lawyer on his behalf. Whether he entered or attempted to enter a plea of not guilty by reason of insanity. Whether he felt that he had a pathological disorder at that time that he discussed the matters with the doctor in 1981, and prior—that is, in 1980, at the time of the alleged offense. J.A. 267.

**17.** This appears most plainly from a closing colloquy between the court and Cecil's counsel, Horn, following the district court's final ruling that "I will exclude the matter of claimed psychiatric background of this defendant [sic] in the course of his cross-examination." J.A. 290–91. At that point, the following exchange occurred:

> MR. HORN: Judge, again, just for clarification, does that preclude me from asking whether he joined in the attempt to enter a not guilty by reason of insanity plea?
> THE COURT: Yes.

It is obvious that impeachment by cross-examination on either of these bases could have been highly effective here. Contrary to the majority's apparent fall-back suggestion of harmlessness of any error in its exclusion, Majority op. 1442–43, it might obviously have tipped the balance of doubt about the credibility of a witness so manifestly disposed as Creswell to criminal conduct and to protect his own interests at the expense of others caught up in criminal charges. The appropriate test for harmlessness of error in the exclusion of this evidence is whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not swayed by the error." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). I cannot say this with fair assurance here. The government's case against Cecil was utterly dependent upon Creswell's otherwise shaky credibility. Cecil was entitled to impeach it by any effective means that could be kept in reasonable bounds as this clearly could have been.

I believe that the district court unfortunately failed adequately to consider the narrowly limited range of cross-examination and argument actually proposed here; instead became unduly concerned with the collateral consequences of admitting evidence that the defendant did not propose to offer when the motion in limine was being considered; and in consequence deprived the defendant of a legitimate opportunity to impeach the sole witness against him by cross-examination on a point that might well have swayed the jury's judgment. I would therefore vacate Cecil's conviction and remand for a new trial.

## II

Without minimizing the seriousness to Cecil of the district court's discretionary refusal to allow him possibly vital cross-examination, the district court's summary dismissal of the defendants' challenge to the jury selection process presents the more important issue for precedential purposes. For that ruling, as affirmed by the majority here, has critical implications both for the ongoing administration of the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq. (the Act), and for future applications of the underlying "fair-cross-section" guarantee of the sixth amendment that the Act implements. Because I disagree with the majority's interpretation of both the Act and the underlying constitutional right in critical respects, I dissent from its affirmance of the district court's ruling and from its reasoning to that result.

In order to explain my disagreement, it is first necessary to be clear about the exact basis of the district court's ruling and the majority's alternative bases for affirmance —one "of law," essentially that relied upon by the district court, and the other a factual basis not addressed at all by the district court.

In the district court the defendants properly moved under § 1867(a) to dismiss the indictment for "substantial failure to comply with the provisions of [the Act] in selecting the ... jury." In support of this motion and in compliance with § 1867(d), defendants filed a sworn statement of facts which, they asserted, "if true, would constitute" such a "substantial failure." Specifically, it was asserted as fact that the juror lists used under the district court's formal Plan were drawn exclusively from Maryland voter registration lists; that recent voter registration lists contained only 60% of those qualified by age to vote, hence to serve on juries; that this therefore automatically excluded 40% of the prospective jurors within the district; that among other groups, blacks and other racial minorities and persons aged 18–34 tended to register as voters in lower percentages (not specifically known) than did the voting-age population at large; that therefore the 40% of those excluded from jury service by exclusive reliance on voter registration lists probably contained disproportionately large numbers of members of these groups; and that the overall consequence of these facts was believed to be a significant underrepresentation of these particular groups on juror lists, thereby violating the fair-cross-

section requirement of the Act and the sixth amendment to the Constitution.

In an effort to develop more specific facts to support and flesh out these factual assertions, defendants moved under § 1867(f) for an order requiring disclosure for their inspection and copying of certain records and papers used in the jury selection process. Among the items specifically requested were forms allegedly filed by district court personnel that would reflect the percentages of racial minorities on the jury lists in recent use.

The district court denied the motion for production of the records and papers on the basis that the defendants' motion papers failed to establish a prima facie case of violation of the fair-cross-section requirement of the Act and the Constitution, and that this was a prerequisite to their right to disclosure. The court then denied on the merits the motion to dismiss the indictments, holding that the defendants' motion papers conclusively demonstrated that they could not prove a prima facie case of violation under *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).

On this appeal, the government has conceded, as it must, *see Test v. United States*, 420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975), that the district court erred in denying the disclosure motion. The defendants' factual assertions in support of their motion were sufficient to confer the "unqualified right" to inspect and copy relevant records that is provided by § 1867(f). They need not go further in proof of their claim to establish this right. *See Test*, 420 U.S. at 30, 95 S.Ct. at 750.

But the government then contended that this error was harmless because, as the district court further concluded, defendants' motion papers conclusively demonstrated that defendants could not prove a violation of the Act or the Constitution. Specifically, says the government, as the district court correctly held, even if significant underrepresentation of racial and age groups on the jury lists were established, this would not prove the "systematic exclusion" of "distinctive groups" which the Act and the Constitution forbid. "Systematic exclusion," urges the government, means intentionally discriminatory exclusion of distinctive groups. Here, defendants have only suggested that substantial underrepresentation results from exclusive reliance upon voter registration lists; they have not suggested intentional discrimination either in denying access to the voter registration process, or in compiling the jury lists. Thus, on the defendants' own allegations, any underrepresentation that could be shown would only be chargeable to the inaction of prospective jurors in failing to register, not to any governmental discrimination. Therefore, accepting all of the defendants' assertions, whether of fact or of probabilities respecting underrepresentation, no violation of the fair-cross-section requirement of the Act or Constitution would be proven.

In sum, the government has argued on appeal that even substantial underrepresentation of distinctive groups that is traceable solely to exclusive reliance on voter registration lists from which members of those groups have freely excluded themselves cannot constitute a violation of the fair-cross-section requirement. Or, put differently, that exclusive reliance upon voter registration lists is per se compliance with the fair-cross-section requirement where no intentional discrimination in composing either voter or jury lists is shown.

As I understand the court's holding today, it essentially adopts this legal position as the primary ground for its affirmance of the district court's dismissal of the jury challenge, *see* majority op. 1444–51. It then holds alternatively that, in any event, the record on appeal, fleshed out by taking judicial notice of various official data, conclusively demonstrates that no group identified by defendants is both "distinctive" and "substantially underrepresented" on the relevant grand or petit jury venires. Majority op. 1451–55.

I disagree with both of these alternative grounds for affirmance.

On the much more critical legal ground, I believe that under controlling Supreme Court authority any "substantial underrep-

resentation" of "distinctive groups" on grand or petit jury venires incident to the government's reliance upon voter registration lists as its exclusive source for composing juries violate the fair-cross-section requirement of the Act and the sixth amendment. I think this is so even though the government has not intentionally discriminated against members of the group in either the voter registration or jury selection processes, and though underrepresentation might be traceable ultimately only to the voluntary failure of members of the distinctive group to register as voters in sufficient numbers.

On the alternative ground, I think that the facts are not sufficiently developed on the meager record we review, even when supplemented by judicial notice of the data relied upon by the court, to resolve the critical factual issues, never addressed by the district court, as to whether there may be substantial underrepresentation of at least one "distinctive group" among those identified in the defendant's motion.

I take the legal and factual bases in order.

## A

The court's rationale for its legal position—a rationale apparently adopted by a number of other courts [18]—focuses on the fact that, absent discriminatory causes, underrepresentation on jury lists that traces to "underrepresentation" on voter registration lists is chargeable only to a free choice of those who have failed to register. Such underrepresented groups cannot therefore be considered "cognizable" under the policies that underlie the Act and, behind the Act, the fair cross-section requirement of the sixth amendment. *See Camp v. United States,* 413 F.2d 419, 421 (5th Cir.1969) (Jehovah's Witnesses "who do not choose to register" not a "cognizable" group).

I simply disagree with that rationale,[19] and believe that intervening Supreme Court decisions flatly undercut it.

Starting with *Camp,* the stated rationale of these decisions and now of this court is that it is not unfair—hence does not violate either statutory or constitutional "fair cross-section" requirements—for govern-

---

**18.** The rationale goes back at least to *Camp v. United States,* 413 F.2d 419 (5th Cir.1969), and has at some time apparently been followed by the courts in *United States v. Evans,* 542 F.2d 805, 812 (10th Cir.1976) (asserting that "the circuits are in complete agreement" on the proposition); *United States v. Freeman,* 514 F.2d 171, 173 (8th Cir.1975) (cited by government) (Indian underrepresentation by "their own indifference" provides no basis for challenge); *United States v. Lewis,* 472 F.2d 252, 255–56 (3d Cir. 1973) (cited by government) (no violation where underrepresentation of blacks is "result of their own inaction"); *United States v. Guzman,* 468 F.2d 1245, 1248 (2d Cir.1972) (no supplementation required unless "obstacles [to register] are placed in the paths" of underrepresented group members); *United States v. Ross,* 468 F.2d 1213, 1216 (9th Cir.1972) (no violation where no showing that "right of young persons to register … has been inhibited in any way").

**19.** As do other federal courts. *See, e.g.,* the following decisions in which, without according presumptive validity to plans relying exclusively on voter registration lists, courts have analyzed claims of underrepresentation solely traceable to that factor: *United States v. Pepe,* 747 F.2d 632, 648–49 (11th Cir.1984); *United States v. Jenkins,* 496 F.2d 57, 64–66 (2d Cir.1974); *Waller v. Butkovich,* 593 F.Supp. 942, 948–58 (M.D. N.C.1984). *See also United States v. Armsbury,*

408 F.Supp. 1130, 1139–40 (D.Ore.1976) (expressly rejecting *Camp* rationale); *United States v. McDaniels,* 370 F.Supp. 298, 301–12 (E.D.La. 1973) (same; semble), *aff'd sub nom. United States v. Goff,* 509 F.2d 825 (5th Cir.1975).

Interestingly, the recent First Circuit cases heavily relied upon by the majority op. 1445–1446, as supporting its position, *Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) (en banc); *Anaya v. Hansen,* 781 F.2d 1 (1st Cir.1986); and *United States v. Lynch,* 792 F.2d 269 (1st Cir.1986), do not do so, but to the contrary support the position taken in this dissent. Those decisions merely held that a number of group characteristics—age, type of work, educational level—do not make the relevant groups "cognizable" or "distinct" for fair cross-section underrepresentation purposes, unless made so by specific "invidious" governmental discrimination. *Anaya,* 781 F.2d at 7. But the decisions at the same time expressly recognize that if a group is intrinsically "distinct" or "cognizable" (such as women and racial minorities), a simple showing of significant statistical underrepresentation without regard to cause, constitutes prima facie proof of a violation of the fair cross-section requirement of the Act or the sixth amendment, *Barber,* 772 F.2d at 998; *Anaya,* 781 F.2d at 7; *see also United States v. Marcano–Garcia,* 622 F.2d 12 (1st Cir.1980) (viable underrepresentation claim recognized without proof of intentional discrimination).

ment to exclude persons from jury service for reasons traceable solely to those persons' own uninhibited choices. A passage from the Act's legislative history may be the source of the rationale, *see United States v. Armsbury,* 408 F.Supp. 1130, 1140 (D.Ore.1976); certainly it expresses the same notion.

In a sense the use of voter lists as the basic source of juror names discriminates against those who have the requisite qualifications for jury service but who did not register or vote. This is not unfair, however, because anyone with minimal qualifications—qualifications that are relevant to jury service—can cause his name to be placed on the list simply by registering or voting. No economic or social characteristics prevent one who wants to be considered for jury service from having his name placed in the pool from which jurors are selected. H.R.Rep. No. 1076, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 1794–95.

The problem with this view as a basis for decision—whether as an assumed direct expression of legislative intent or as an independently derived rationale—is that it relates to only one of the policies behind the Act, and not at all to the central sixth amendment right that the Act seeks to implement.

The Act expressly identifies two policies that it seeks to implement: (1) that all litigants "shall have the right to grand and petit juries selected at random from a fair cross section of the community," and (2) that "all citizens shall have the opportunity to be considered for [jury] service." 28 U.S.C. § 1861.

The quoted passage of legislative history and the rationale of the *Camp* line of decisions and now of this court have obvious relevance to the second policy—that of securing to "all citizens" a fair opportunity to *serve* on juries. Therefore, if viewed only from the perspective of the intended beneficiaries of that policy—prospective jurors —it makes sense to hold that when they have excluded themselves, there has been no violation of that policy. But this pas-

sage of legislative history and the parallel rationale of the *Camp* line of decisions have no relevance to the first policy—that of securing to *criminal defendants* the right to be charged and tried by jurors randomly chosen from a fair cross section of the community. Consequently, the mere fact that the second policy may not be violated when underrepresentation results from self-exclusion does not mean that the first policy may not be.

That this is so is indeed reflected in other portions of the Act's legislative history that focus on the policy of securing the rights of criminal defendants respecting juror selection processes rather than the correlative but different rights of prospective jurors to serve. The Act's policy respecting defendants' rights implements and directly mirrors the fair cross-section requirement rooted in the sixth amendment. *See Taylor v. Louisiana,* 419 U.S. 522, 528–30, 95 S.Ct. 692, 696–98, 42 L.Ed.2d 690 (1975); *United States v. Herbert,* 698 F.2d 981, 984 (9th Cir.1983); *United States v. Test,* 550 F.2d 577, 584 (10th Cir.1976); *United States v. Whiting,* 538 F.2d 220, 222 (8th Cir.1976). Reflecting this, the legislative history explains that voting lists "need not perfectly mirror the percentage structure of the community," but nevertheless admonishes that:

> any substantial percentage deviations must be corrected by the use of supplemental sources. [H.R.Rep. No. 1076, at 1794.]

\* \* \* \* \* \*

Jury performance will be enhanced as well by closer approximation of the cross sectional goal under the bill. It must be remembered that the jury is designed not only to understand the case, but also to reflect the community's sense of justice in deciding it. As long as there are significant departures from the cross sectional goal, biased juries are the result—biased in the sense that they reflect a slanted view of the community they are supposed to represent. [*Id.* at 1797.]

\* \* \* \* \* \*

[I]n accord with section 1863(b)(2), voter lists will be supplemented by other sources of names if they do not reflect a community cross section. [*Id.* at 1798.]

\* \* \* \* \* \*

[M]oreover, *the bill recognizes that in some areas voter lists of all kinds may be insufficient to implement the policies of the act, by reason of local voting practices. Where that is true, the plan must prescribe other sources to supplement the voter lists.* [*Id.* at 1799 (emphasis added).]

These excerpts from the Act's legislative history conclusively demonstrate a legislative intent that underrepresentation resulting from exclusive reliance on voter registration lists might violate the Act even though traceable ultimately to self-exclusion by free choice of members of underrepresented groups.

More critically, *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), elaborating on *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), buttresses if it does not compel this reading of the statute by its analysis of the underlying sixth amendment right.[20] Addressing a sixth (and fourteenth) amendment fair-cross-section challenge to a criminal defendant's state court conviction, the Court considered the effect of underrepresentation of women on jury lists resulting from their self-exclusion under a state law exemption privilege. Assuming that self-exclusion was the effective cause of under-

representation, and concluding that no significant justification for the exemption-privilege had been shown, the Court held that "exclusion" by this process was "systematic." *Id.* at 366, 99 S.Ct. at 669. Because the degree of underrepresentation was also found constitutionally unacceptable (less than 15% represented out of 54% eligible), *id.,* the Court found the sixth amendment fair-cross-section requirement violated.

*Duren* thus undermines the critical assumption made by this court that the fair-cross-section requirement only protects against intentional discrimination in the jury selection process; that exclusion of distinctive groups from jury lists is only "systematic" if it results from intentional discrimination. Rather, as *Duren* expressly recognizes, it protects more broadly against any process of jury selection which produces jury master lists on which "distinctive groups" are substantially underrepresented for *any* reasons "inherent" in the process used by government to constitute the lists, i.e., other than the vagaries of chance in a random selection process. *Id.* at 366, 99 S.Ct. at 669.[21] Specifically, on the direct authority of *Duren* and *Taylor,* it is now clear that "systematic exclusion" may be found where substantial underrepresentation results from self-exclusion by members of the distinctive groups when that self-exclusion is permitted by—is thus "inherent in"—a challenged process.

Therefore, just as the permitted self-exclusion of women leading to their underrep-

---

**20.** *Duren* was decided after the last of the *Camp* line of decisions cited in note 18, supra. For that reason, it may be questioned whether those decisions are still considered authoritative on the issue by the rendering courts. Against this possibility, it must be conceded that some of the courts have, since *Duren,* continued to rely upon pre-*Duren* decisions applying the *Camp* rationale. *See, e.g., Brown v. Lockhart,* 781 F.2d 654, 656 (8th Cir.1986) (*citing United States v. Freeman,* 514 F.2d 171); *United States v. Afflerbach,* 754 F.2d 866, 869–70 (10th Cir.1985) (*citing, inter alia, United States v. Lewis,* 472 F.2d 252).

As can be seen from these cases and those collected in notes 18 and 19, the lower federal courts are probably simply in conflict on the issue.

**21.** *Duren,* incidentally, identifies the different constitutional sources of the dual policies of the Act, hence the different constitutional tests for violation of the two, and in that process also probably identifies the source of the flawed *Camp*-line rationale. Pointing out that the equal protection right of citizens to serve on juries is protected only against intentional denials of the right, the Court distinguished that right (as it might be directly or derivatively asserted) from the sixth amendment fair-cross-section right of defendants. The latter right, the Court noted, is violated by "systematic disproportion itself." *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26.

The *Camp* rationale is thus shown to be apposite only to the equal protection right, not to the sixth amendment right, both of which are sought to be implemented by the Act.

resentation on jury lists was found to violate the constitutional fair-cross-section requirement in *Duren* and *Taylor*, so the alleged underrepresentation of distinctive groups by their self-exclusion from exclusive-source voter registration lists *might* be found here to violate the fair-cross-section requirement of the Constitution and the Act.[22]

## B

In its fall-back position, the court holds that even if substantial underrepresentation traceable to exclusive reliance on voter registration lists could constitute a statutory and constitutional violation, the record here, fleshed out by judicial notice, conclusively shows that there is no substantial underrepresentation of any of the distinctive groups tentatively identified by defendants. It may well be that this is the ultimate fact of the matter. Indeed my own instinct is that it quite probably is. But I do not think that under the circumstances we should attempt to make that determination on this appeal. The district court has never, of course, addressed the specific question of statistically significant underrepresentation. On the meager factual record before it, it could not have. This court has now sought to flesh out the record by taking judicial notice of certain census data concerning national, regional and Maryland voter registration percentages involving blacks and whites (and in a most amorphous way, different age groupings). The court confidently asserts that the data it has selected is the appropriate

data and that it conclusively demonstrates that none of the identified groups are substantially underrepresented.

Again, my instinct is that the court selected data, at least that related to black and white voter percentages in the Maryland district as of November 1982, is probably the most appropriate available data concerning voter registration figures for those groups and that it is accurate. But this data has never been subjected to adversarial party scrutiny. The course of proceedings in both the district court and this court have provided no opportunity for that. And, even more critically, all the data stops at the level of voter registration percentages. While it may be assumed, as the court obviously does, that there has been no contrivance or slip-up in converting voter registration lists directly to master jury lists, this can only be assumed by this court. The challenge here is not—as the court continually seems to believe—to underrepresentation on voter registration lists or to the use *vel non* of those lists as the exclusive source of master jury lists. The challenge—at this stage avowedly tentative—is to underrepresentation on the master jury lists from which jury venires and panels are required to be drawn randomly. This, not corruption of the voting franchise, is what the Act is designed to guard against. 28 U.S.C. § 1861 (policy declaration). And it is data showing the ultimate composition of master jury lists and venires that the Act allows defendants to discover in order to perfect their tentative challenges. 28 U.S.C. § 1867(f). The critical datum, therefore, is that showing

---

**22.** The majority says that *Duren* does not control decision here because there the self-exclusion occurred at the jury selection stage rather than, as here, at the voter registration stage. Majority op. 1449–1451. With all respect, this is a distinction without a difference. Where the governmental process used is one in which the voter registration list is exactly the same as the master jury list, self-exclusion from the one is directly self-exclusion from the other. Here, as surely as in *Duren*, the phenomenon by which the potential master list of potential jurors could be reduced by a process of permitted self-exclusion is "inherent" in the system by which a particular jury venire is ultimately composed. That the privilege of direct exemption from jury service was expressly authorized by

statute in *Duren* while the privilege not to register as a voter simply results from the absence of governmental compulsion to exercise the voting franchise here—is equally a distinction without a difference.

On this point the majority cites, *see* majority op. 1450, 1451, the present Chief Justice's comment in denying a stay in *California v. Harris*, 468 U.S. 1303, 105 S.Ct. 1, 82 L.Ed.2d 807 (1984), as making "clear" the correctness of its view. With all deference, I believe a more suitably cautious reference would emphasize the Chief Justice's remark that the issues on which we on this court now disagree "are by no means open and shut questions under *Duren*." *Id.* at 1304, 105 S.Ct. at 1.

the representation of any groups determined to be "distinctive" on the master jury lists at the critical time. That datum is simply not in the record even as expanded, and although it is supposed perfectly to match the voter registration lists, that can only be assumed on the present record.

Even though the risk of factual error in making the underrepresentation determination on this judicially expanded record may be thought minimal, it is clearly present. In my view, with the case at this stage, considerations of delay and judicial economy simply do not justify running that risk. I would therefore vacate the judgments and remand to the district court for reconsideration of the jury selection challenge after defendants have been allowed to inspect, reproduce, and copy the jury selection records whose disclosure they have sought and erroneously been denied. See Test v. United States, 420 U.S. 28, 30, 95 S.Ct. 749, 750, 42 L.Ed.2d 786 (1975); United States v. Lawson, 670 F.2d 923, 930 (10th Cir.1982); United States v. Marcano–Garcia, 622 F.2d 12, 18 (1st Cir.1980). This would obviously not require wholesale reversal of the convictions. Jurisdiction should be retained in this court for the limited purpose of reviewing the district court's ruling on the properly considered challenge. If the district court denied the challenge, it could be authorized simply to reinstate the judgments of conviction (except that of Cecil). See Marcano–Garcia, 622 F.2d at 18.[23]

### III

At this point it seems appropriate to address the parade of practical evils that the court suggests must attend all underrepresentation challenges that are not confined narrowly to intentional discrimination. See majority op. 1454–1455. These are apparently advanced both to support the court's narrow reading of the permissible basis of challenge intended by the Act, and possibly to justify the court's venture into appellate fact-finding in order to spare the district court that function in this case.

With all respect, the court's assumptions and fears are considerably overwrought.

In the first place, the possibility of such challenges in any criminal case has been expressly created by Congress, as an integral part of the Act's approved plan regime. It is obvious that the predominant purpose is to provide a means for questioning whether approved plans relying exclusively upon voter registration lists are actually providing the fair cross section of jurors that the Act is designed to insure. That they may not over time continually do so, for whatever reason, is obvious, and Congress clearly assumed that they might not always do so. The procedure for mounting such challenges is not therefore, as the court seems to suggest from time to time, a contrivance of the defendants in this case, but is a safeguard deliberately designed by Congress to justify primary reliance on voter registration lists. We obviously may not negate a procedure provided by Congress because of concerns about its possible abuses.

Being available, the procedure is certainly subject to abuse by irresponsible defense counsel and the court here is obviously much concerned with that possibility. But

---

23. The remand I propose would of course express no opinion on the ultimate merits of the jury selection challenge. It would simply direct consideration of the challenge under the proof scheme outlined in Duren. Under that scheme a challenge establishes a prima facie violation by showing that (1) there is a distinctive group (or groups) in the community (2) which is substantially underrepresented on relevant jury venires in relation to its numbers in the community (3) due to systematic exclusion of group members in the jury selection process. Duren, 439 U.S. at 364, 99 S.Ct. at 668.

The holding I propose in this dissent would only have decided prong (3) in this scheme:

that any underrepresentation of distinctive groups traceable to exclusive reliance on voter registration lists would be "systematic exclusion."

Even if a prima facie violation were shown, the process might yet be found not to violate the fair cross section right if the government proved that "attainment of a fair cross section [is] incompatible with a significant state interest." Id. at 368, 99 S.Ct. at 670.

This is obviously business for trial courts rather than appellate courts attempting to act in the first instance on records largely constructed by unchallengeable judicial notice.

there is ready practical protection against that risk which, if effectively used, will substantially minimize the dread consequences that the court envisions.

This protection lies in effective advocacy by government counsel and effective management of the challenges by district courts. If these occur, not only may nonmeritorious specific challenges be summarily (but properly) disposed of, but the scope of future challenges may be systematically narrowed by *stare decisis.*

In meeting an underrepresentation challenge to the jury array, the government may always of course deny at the threshold that particular groups identified as "distinctive" by the challenge are indeed so. This will present an issue that can ordinarily be determined as a matter of law under well-developed legal principles. For example, the First Circuit has now, by that process, pretty effectively narrowed to racial minorities and women the groups that will be considered cognizable in that circuit, specifically ruling out groups based on age, educational level, and economic class.[24] As a matter of fact, the District Court for the District of Maryland has earlier held that "age alone does not define a distinct group," *United States v. Blair,* 493 F.Supp. 398, 406 (D.Md.1980), *aff'd on other grounds,* 665 F.2d 500 (4th Cir.1981), and that precedent could of course have been directly applied here to reject the 18–34 age group challenge.

Beyond this threshold means of summarily rejecting claims for lack of group cognizability, there is an almost equally ready means for summarily but properly rejecting nonmeritorious claims of substantial underrepresentation of admittedly "cognizable" groups. As indicated earlier, the critical datum on underrepresentation is the proportional representation of cognizable groups on the relevant *master jury lists* and *venires.* There is no apparent reason why this datum cannot be presented quickly and decisively by government counsel to demonstrate that exclusive reliance on voter registration lists is not producing substantial underrepresentation of particular groups on the relevant jury lists and venires. To fail to do so on the basis that the challengers have the burden to prove underrepresentation would seem the height of folly. Indeed it would seem no great administrative inconvenience for the persons charged with administration of approved jury plans to maintain on a continuously updated basis the data as to those groups clearly established as "cognizable" under controlling precedent. By the development of precedent, these groups may well be narrowed fairly quickly (possibly, as in the First Circuit, essentially to women and the dominant ethnic minority). Under such an administrative regime, which might well be specifically directed by district courts, this evidence would be readily available to government counsel for quick and effective use to forestall nonmeritorious underrepresentation claims at the threshold.

As the majority points out, experience is demonstrating the wisdom of Congress' authorization of primary reliance on voter registration lists as the source of master jury lists and ultimately of venires. This should work and it demonstrably is working. But that the national experience has demonstrated the wisdom of the legislative judgment does not of course confer a general immunity to specific challenges of specific district plans. The answer in individual districts lies rather in wise utilization by government counsel and the district courts of the ready means for demonstrating that the national experience holds true for the district.[25]

### A.

In sum, I disagree most critically with the majority's primary holding that the Act and the underlying sixth amendment fair cross section requirement protect only against intentional discrimination. I be-

**24.** *Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985) (en banc); *Anaya v. Haman,* 781 F.2d 1 (1st Cir.1986); *United States v. Lynch,* 792 F.2d 269 (1st Cir.1986).

**25.** Of course, there is another safeguard against flagrant abuses of the challenge procedures: the inherent power of the district courts to discipline attorneys.

lieve instead, that the Act, implementing the sixth amendment, goes beyond the prohibition of intentional discrimination and requires that where substantial underrepresentation exists by virtue of exclusive reliance on voter registration lists, affirmative measures must be taken to insure realization of the fair cross section requirements. *See United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974).

Beyond this, I also disagree with the court's effort to decide on this appeal that in fact there is no substantial underrepresentation of any group suggested by defendants. That determination is one properly made in the first instance by the district court, which has not yet addressed it, and which could now determine it without undue burden and without significant disruption of the progress of this case to its conclusion.

Judge WINTER and Judge MURNAGHAN have asked to be shown as joining in this separate opinion.

